**UNITED STATES of America, Appellee,**

v.

**Robert CAPO, Tadeusz Snacki, a/k/a "Ted Snacki", Walter Snacki, Defendants-Appellants.**

**Nos. 409, 421 and 432, Docket 85–1290, –1291 and –1292.**

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1985.

Decided May 30, 1986.

Rosemary G. Roberts, Asst. U.S. Atty., Rochester, N.Y. (Salvator R. Martoche, U.S. Atty. for Western District of N.Y., on brief), for appellee.

Ronald S. Carlisi, Rochester, N.Y., for defendant-appellant Robert Capo.

Norman A. Palmiere, Rochester, N.Y., for defendant-appellant Tadeusz Snacki.

James R. Brown, Rochester, N.Y., for defendant-appellant Walter Snacki.

Before: TIMBERS, KEARSE, and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Robert Capo, Tadeusz Snacki, a/k/a Ted Snacki ("Ted"), and Walter Snacki ("Walter") appeal from judgments of conviction entered in the United States District Court for the Western District of New York after a jury trial before Michael A. Telesca, *Judge.* All three defendants were convicted on one count of conspiring to engage in an extortionate job-selling scheme affecting interstate commerce, in violation of the Hobbs Act (sometimes the "Act"), 18 U.S.C. § 1951 (1982). In addition, Capo was convicted on five counts of substantive violations of the Hobbs Act, one count of obstruction of justice in violation of 18 U.S.C. § 1503 (1982), and one count of tampering with a witness in violation of 18 U.S.C. § 1512 (1982); he was acquitted on three additional counts charging substantive violations of the Hobbs Act. Ted was convicted on two counts of substantive violations of the Hobbs Act and on one count of obstruction of justice in violation of 18 U.S.C. § 1503; he was acquitted on one additional count charging a substantive Hobbs Act violation. Walter was convicted on six counts of substantive violations of the Hobbs Act and on one count of making false statements in violation of 18 U.S.C. § 1001 (1982); he was acquitted on one additional count charging a substantive Hobbs Act violation. Each defendant received a suspended sentence of three years' imprisonment and was placed on probation for three years on each count, the sentences to run

concurrently on all counts. As a special condition of probation, each defendant was directed to perform 500 hours of community service.

On appeal, defendants contend principally that their conduct was not within the purview of the Hobbs Act and that the evidence was insufficient to convict them on any count. We disagree and affirm the convictions.

## I. BACKGROUND

The prosecution focused on a scheme to sell jobs at Eastman Kodak Company ("Kodak"), a multinational corporation with its principal offices in Rochester, New York. Taken in the light most favorable to the government, the evidence at trial revealed the following.

At one of its main manufacturing facilities, the Elmgrove Plant ("Elmgrove"), also located in Rochester, Kodak employed approximately 13,000 people. Its normal practice was to hire nonprofessional employees from among some 55,000 individuals who had applications on file and who periodically updated their applications to indicate their continued interest in employment at Kodak. When positions were available, an employment counselor would review a computer printout listing applicants with the requisite skills or background, and would then review the applications of individuals on that list. Factors considered in selecting employees included prior experience, prior employment with Kodak, the length of time the application had been on file, references, and having relatives already employed by Kodak. The same procedures were supposed to be followed for Kodak's "supplemental hirings," which occurred at times of peak employment need. Supplemental jobs were usually of limited duration, ranging from several months to a year.

In early 1981, John Baron, an unindicted coconspirator who testified at trial for the government, began working in Kodak's Industrial Relations Department as an employment counselor. Baron was put in charge of hiring at Elmgrove. His first assignment was to hire permanent production employees, giving preference to approximately 1,400 supplemental employees who had been laid off in 1980. After exhausting this 1,400-person list, Baron continued to hire permanent production employees from the applicant pool.

Beginning in April 1981, indicted coconspirator Stanford Forte, Sr., a supervisor at Elmgrove, asked Baron to hire certain individuals as a favor to Forte. Among these individuals hired by Baron in 1981 were Ted and Ted's wife, daughter, and nephew. In connection with his hiring of Ted's family, Baron was given a leather coat and a color televsion set. In addition, Forte gave Baron a Betamax video recorder and asked him to hire three other individuals. The three were hired; they gave Forte $1,500, which Forte split with Baron. In January 1982, Ted, who was only a nodding acquaintance of Baron, helped Baron move to a new house. During the move, Ted asked Baron to hire his son; Baron agreed, and hired the son. In February 1982 Ted gave Baron $400 in cash as a wedding present.

### A. *Evidence of the Job-Selling Scheme*

In January 1982, Elmgrove's production needs increased and Baron began hiring supplemental employees. Because the standard hiring procedure was laborious and time-consuming, and because individual applications would often be missing from the files while they were being updated in the computer listings, Baron started accepting lists of prospective employees, together with applications, from supervisors, managers, and other Kodak employees. Hiring individuals from such "referral lists" was a practice apparently known to Baron's superiors, and tacitly approved by them. Forte was one person giving referral lists to Baron; all of the individuals on Forte's lists, referred by Forte or by Ted, were hired. Among those referred by Ted and hired by Baron were a number of persons who testified that they had paid amounts ranging from $500 to $1,000 to Walter, Ted, or Capo, to obtain jobs at Kodak for themselves, friends, or relatives

in early 1982. During this period, Baron continued to receive "gifts" from Ted.

### 1. *Jobs Sold by Walter*

In the summer of 1981, Walter, who worked for a company called Rochester Products, had told a fellow worker that he could get the coworker's daughter a job at Kodak if the coworker had enough money. Overhearing this, another employee, Josephine Kane, had asked Walter if he could get her husband a job at Kodak. Walter said he would let her know. A few months later, Kane again asked Walter about a job for her husband. Walter said that for $500 he could get Kane's husband a job, and he instructed her to complete an application but to leave the date blank. Kane gave Walter her husband's application, but said she would not pay until he had been hired. Kane's husband was soon offered a job at Kodak but declined it. In January 1982, Kane again approached Walter about a job for her husband; Walter told her, "This time ... I need the money first." Kane gave Walter a $500 check, which was deposited in his checking account. Kane's husband was soon hired at Kodak.

In the meantime, Kane had told Antonina ("Annie") LaDelfa, a janitor at Rochester Products, about the availability of Kodak jobs through Walter. Annie, who was supporting six daughters and a grandson, was anxious to get good jobs for her daughters Rita LaDelfa, who was in a low paying job, and Vivian Pfund, who was unemployed, divorced, and supporting a young son. Although Rita had submitted applications at Kodak since 1977 and updated them, she had never been called for an interview. Pfund had worked at Kodak several years before, been laid off, and not been called back, even though she had tried several times to reapply. Annie had tried to get her daughters jobs through her brother-in-law, who worked at Kodak, but had been told that none were available. After discussing the $500 price with her daughters, Annie borrowed the money from her credit union, gave Kane Rita's application and a $500 check, and later gave Walter Pfund's

application and a $500 check. Both checks were deposited in Walter's checking account, and in January 1982, Rita and Pfund were hired at Elmgrove.

In the same month, Peter Riccardi, an assembly worker at Rochester Products, spoke with Walter about his financial concerns. Riccardi had two children, and his wife was unemployed; his wife had applied to Kodak many times but had never been interviewed, even when Kodak was hiring large numbers of people. Walter responded that he could help Riccardi's wife get a job at Kodak, "but it might cost you something," stating a price of $500. Riccardi paid Walter $500 and his wife was hired at Elmgrove a week later.

Another Rochester Products employee, Paul Kelso, who was married and had two children, wanted to separate from his wife, but financial difficulties prevented this. Kelso's wife had applied for work at Kodak and had talked to her brother, who worked there, about getting a job, but she had never been called for an interview. Walter told Kelso that he could help Kelso's wife get a job at Kodak if Walter were paid $500. When Kelso questioned the payment, Walter replied "You want her to get a job, don't you." Kelso responded affirmatively and paid. Baron soon hired Kelso's wife.

Another Rochester Products employee, Robert Drelick, had five children; his wife, laid off from her job two years before, had unsuccessfully sought work at Kodak. In February 1982, Walter approached Drelick, asking if Drelick's wife was looking for a job at Kodak and said he could help but "[i]t's going to cost you a little," naming a price of $600. After discussing it with his wife, Drelick paid Walter the money. Drelick's wife was soon hired at Kodak.

### 2. *Jobs Sold by Ted*

In March 1982, Joseph Scavo gave Ted's daughter two $500 checks, one for a job for his friend, Michelle Sofia, and one for a job for his sister, Dawn Himmelsbach. Himmelsbach was unemployed, raising three children, and fighting a court dispute over

their custody. Scavo was providing money for the support of Himmelsbach and the children. Scavo's checks were endorsed "T. Snacki" and cashed. A few weeks later, Scavo called Ted and told him that neither woman had been hired. Ted replied that he would investigate. Soon thereafter, both women were hired.

### 3. *Jobs Sold by Capo*

In March 1982, Robert Capo, a barber in a Rochester suburb, began telling friends and customers that he could help them get jobs at Kodak for a price of $1,000. Capo told his sister-in-law that his contact at Kodak was Ted and that he was able to assure these jobs because Ted knew someone in Kodak's personnel department. Capo had several takers.

Bernard Gauthier, who had been laid off from his job several months earlier, had submitted and updated several applications at Kodak. Capo, a longtime friend, told him to fill out a new application and that Capo would get him a Kodak job for $800. When Gauthier questioned why he had to fill out a new application, Capo told him, "[I]t has to be this way." Shortly after he paid Capo the $800, Gauthier was hired at Elmgrove. Gauthier soon arranged a job at Elmgrove for his son Brian as well, again by paying Capo the "bargain" rate of $800. Brian got this job through Capo after he had been interviewed on his own but had not received an offer.

Capo also offered to get a job at Kodak for the wife of Peter Iascone. She declined, but her husband, who was having business difficulties, asked Capo to get him a job. Capo demanded $800 in cash; Iascone paid him and was soon hired. Capo subsequently told Iascone that the "doors are closing" at Kodak, and that if anyone else wanted a job, he should let Capo know, indicating that the price would be $1,000. Iascone soon gave Capo an application and $1,000 from a friend, Sam DeLeo. DeLeo was unemployed, separated, and paying support for two children. Although he had relatives working at Kodak and had applied there, he had never been called for an interview. After paying Capo, DeLeo was hired at Kodak.

Robert Frechette also had relatives working at Kodak, and for the previous five years he had submitted applications to Kodak; he had never been called for an interview. In April 1982, Frechette worked at part-time jobs; he, his wife, who was unemployed, and his child lived with his parents. He had sought employment at Kodak, at "all the big companies," and "[j]ust about everywhere [he] could think of going." When Capo indicated that "[h]e knew somebody that could get [Frechette] in [at Kodak], but that it would cost [Frechette] a thousand dollars," Frechette paid the money. Upon accepting payment, Capo told Frechette, "No problem. You're in." Frechette was soon hired by Baron.

### B. *The FBI Investigation and the Defendants' Reactions*

The FBI investigation into possible Hobbs Act violations concerning the selling of jobs at Kodak began in May 1982. Grand jury subpoenas were issued at least as early as October 1982. Baron learned of the investigation in the fall of 1982 and contacted Forte. Forte denied knowing anything about a job-selling scheme and said he thought Ted was using both Forte and Baron. Forte later told Baron that he had talked with Ted, who was nervous "because there was a check involved of some sort.... His brother was involved in it somehow." Following these conversations, Baron threw several of the gifts he had received, including a stereo and two Betamax recorders, into a dumpster.

In April 1982, Kane had given Walter $600 and an application for her sister, Carmella Angora, who had previously applied at Kodak and updated her application as required, but had never been interviewed. A month later, Angora had still heard nothing about the job. Kane asked Walter about the money, and Walter told her he had "already turned it over," and not to worry about the job. In the summer of 1982, when Kane again spoke to Walter about the job for Angora, he told her the

FBI was investigating at Kodak. Angora was never hired.

In November 1982, FBI agents interviewed Walter, inquiring about the $500 check from Kane and the two $500 checks from Annie LaDelfa. Walter told them he had worked on Annie's car and replaced the crank shaft, charging her $1,000, and that Kane's check was payment for his winning the Super Bowl pool that Kane ran at Rochester Products. When it was pointed out that Kane's check predated the Super Bowl, Walter replied, "Well, maybe she knew I was going to win." When agents later questioned Kane and Annie LaDelfa, the former denied any involvement with a Super Bowl pool, and the latter denied that Walter had worked on her car.

In August 1982, Capo had called Bernard Gauthier to tell him that there was an investigation at Kodak and that Gauthier should keep quiet if anyone called him. After the FBI attempted to contact Gauthier in January 1983, Gauthier spoke with a lawyer and decided to testify before the grand jury. When he told Capo of his intention, Capo tried to persuade him not to testify, assuring him that no one else was talking. In his efforts to persuade Gauthier not to talk, Capo stated, "I want you to know that I'm not involved with the mob." He also mentioned a "Tony G.," the brother of a known organized crime figure in the area, saying that "Tony G. says hang tight. If everybody keeps their mouth shut, there's no problem." Capo pointed out to Gauthier that a chain was only as strong as its weakest link. Gauthier nonetheless testified before the grand jury in February 1983.

Capo also tried, with some initial success, to persuade Frechette not to reveal that he had purchased his job. Frechette agreed to conceal the purchase, and when he was first questioned by the FBI in February 1983, he stated that he had not paid for his job at Kodak. After Frechette told Capo he had been subpoenaed by the grand jury, Capo continued to urge him not to worry and to remain silent. In March 1983, how-ever, Frechette testified to the grand jury that he had purchased his job.

Early in 1983, Ted spoke with Scavo, telling him there was an investigation and instructing him not to talk about the money he had paid to get jobs. He told Scavo to say, if asked, that Scavo had bought a ring or some other object from Ted. Prior to Scavo's testifying before the grand jury, Ted again approached him, telling him that he might be questioned, instructing him to remain quiet, and telling him to tell the people for whom he had purchased jobs also to remain quiet. Scavo nonetheless testified before the grand jury in July 1983.

## C. *The Present Prosecution*

The grand jury eventually returned indictments against these defendants and others. After a jury trial, all three defendants were convicted of conspiring to sell jobs, in violation of the Hobbs Act, 18 U.S.C. § 1951. Capo was convicted of substantive Hobbs Act violations with respect to the sale of jobs to Bernard Gauthier, Brian Gauthier, Iascone, De Leo, and Frechette; of obstruction of justice, in violation of 18 U.S.C. § 1503, on account of his conversations with Frechette; and of tampering with the witness Bernard Gauthier, in violation of 18 U.S.C. § 1512(a). Ted was convicted of substantive Hobbs Act violations with respect to the sale of jobs to Sofia and Himmelsbach; and of obstructing justice, in violation of § 1503, on account of his conversations with Scavo. Walter was convicted of substantive Hobbs Act violations with respect to the sale of jobs to Rita LaDelfa, Riccardi, Kelso, Pfund, Drelick, and Angora; and of making false statements to the FBI agents, in violation of 18 U.S.C. § 1001. As indicated above, each defendant was acquitted on one or more additional counts charging substantive Hobbs Act violations.

On this appeal, all of the defendants challenge their convictions under the Hobbs Act on the ground, *inter alia*, that their selling of Kodak jobs was not within the purview of the Hobbs Act. In addition, each of the defendants challenges the suffi-

ciency of the evidence to support his conviction of non-Hobbs Act offenses.

We have considered all of the arguments made by defendants on these appeals and find them to be without merit.

## II. THE HOBBS ACT CONTENTIONS

Defendants make a number of attacks on their Hobbs Act convictions. Principally they contend that the mere selling of jobs cannot constitute "extortion" within the meaning of the Hobbs Act, and that there was insufficient evidence of fear on the part of those to whom defendants sold Kodak jobs to warrant characterizing defendants' activities as extortion within the meaning of the Act. They also contend that the court's jury charge on knowledge was defective, that there was insufficient evidence to show that Walter was a participant in a conspiracy, and that there was insufficient evidence to establish that their activities affected interstate commerce. We find no merit in any of defendants' contentions.

### A. *The Scope of the Hobbs Act*

Insofar as is pertinent to this prosecution, the Hobbs Act provides as follows:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do, ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

....

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of ... fear....

(3) The term "commerce" means ... all commerce between any point in a State ... and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951. Defendants contend principally that their job-selling activities in effect constituted little more than ordinary employment agency conduct that the Hobbs Act was not intended to reach. They argue that, at worst, these activities may have constituted commercial bribery, in which they acted as bribe-giving agents for those who sought jobs, but that the Hobbs Act does not apply to mere commercial bribery. We disagree with defendants' characterizations of their activities, and while we are aware of no prior applications of the Hobbs Act to a job-selling scheme such as this one, we conclude that the Act was properly invoked here.

The essence of extortion within the meaning of the Hobbs Act, as it pertains to the present case, is the extraction of property from another through the wrongful use of fear. The victim's fear need not be fear of bodily harm but may be fear of a loss that is purely economic. *E.g., United States v. Margiotta,* 688 F.2d 108, 134 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Brecht,* 540 F.2d 45, 51 (2d Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *United States v. Hathaway,* 534 F.2d 386, 394 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Tropiano,* 418 F.2d 1069, 1083 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). While commonly the economic loss feared by the victim is the loss of an existing asset, *see, e.g., United States v. Lisinski,* 728 F.2d 887 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984) (fear of losing liquor license), the scope of the Act is not so limited. Thus, the Act has been held to reach conduct threatening the loss of a status that would produce future assets. *See, e.g., United States v. Daley,* 564 F.2d 645, 648 (2d Cir.1977) (employees' fear of losing their jobs and contractors' fear of losing future job assignments), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Margiotta,* 688 F.2d at 133–35 (fear that mu-

nicipal insurance business would be transferred to other agencies, thereby costing the victim future commissions).

Nor is the concept of economic loss under the Act limited to the loss of existing relationships, for that concept has been held to encompass the loss of an opportunity to enter into a business relationship. *See, e.g., United States v. Addonizio*, 451 F.2d 49, 73 (3d Cir.1971) (victims' fear that they would not be awarded certain contacts), *cert. denied*, 405 U.S. 936, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972); *United States v. Brecht*, 540 F.2d at 52 (same); *United States v. Hathaway*, 534 F.2d at 395–96 (same). In *United States v. Tropiano*, we held that loss of the right to do business in an area or to bid for contracts would constitute the requisite economic loss:

> The concept of property under the Hobbs Act ... includes, in a broad sense, any valuable right considered as a source or element of wealth....
>
> ... The right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution. [The] right to solicit accounts ... constituted property within the Hobbs Act definition.

418 F.2d at 1075–76 (citations omitted). In *United States v. Brecht*, we upheld a Hobbs Act conviction of an employee for extracting a $1,000 bribe from a would-be supplier of materials to his company; we noted that the Hobbs Act applied because the victim feared he would have been "denied any chance to obtain a contract unless he paid." 540 F.2d at 52. Similarly, in *United States v. Hathaway*, the First Circuit upheld a Hobbs Act conviction where the defendants had accepted payments totaling $30,000 from a firm that feared that unless it made the payments it would not be awarded two engineering contracts. Although the defendants argued that the victims had had "no prior entitlement to the ... contracts and thus no 'economic loss' to fear," 534 F.2d at 395, the court, quoting

*Tropiano's* explication of the concept of property rights under the Hobbs Act, concluded that "the possibility of lost business opportunities can create a fear of economic loss." *Id.* at 396.

■ We see no sound basis on which to distinguish the type of loss feared in these cases from the type of loss allegedly feared in the case at bar. The loss of an opportunity to obtain employment as a wage or salary earner constitutes no less an "economic loss" than does the loss of an opportunity to obtain a one-time contract for the supply of materials or services. The amounts at stake for the victims may differ; the time periods during which the victims would receive benefits may differ. But the nature of the loss is the same. We conclude that the fear that a job opportunity will be lost is the type of fear whose extortionate exploitation is within the reach of the Hobbs Act.

■ There is a distinction between some of the cases discussed above and the present case, in that in many of those cases the fear of loss was instilled by the defendants themselves. *See, e.g., United States v. Brecht*, 540 F.2d at 47; *United States v. Addonizio*, 451 F.2d at 54–56. This distinction is of no import, however, for it is not necessary that the fear have been caused by the defendant. To establish extortion, the government must prove that the victim had a reasonable fear that the defendant had an intent to exploit; it need not show that the fear was instilled by the defendant. *See United States v. Margiotta*, 688 F.2d at 135; *United States v. Duhon*, 565 F.2d 345, 351 (5th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

We recognize, of course, that fear of economic loss plays a role in many business transactions that are entirely legitimate; awareness of that fear and use of it as leverage in bargaining, in which each side offers the other property, services, or rights it legitimately owns or controls, is not made unlawful by the Hobbs Act. What the Act reaches is not mere hard bargaining but the exploitation of the fear

of economic loss in order to obtain property to which the exploiter is not entitled. Thus, although a job applicant who has long been out of work may have a fear of not obtaining employment that would constitute a fear of economic loss within the meaning of the Act, the Act would not ordinarily reach, for example, the efforts of a prospective employer to bargain down the level of compensation to be paid to the applicant. Nor would it reach the normal activities of an employment agency in dealing with the applicant even if, for example, the agency required payment from its applicants of some sort of filing fee, service charge, or contingent fee. The activities of the defendants here, however, could not reasonably be viewed as mere employment agency activities. The sums demanded from those seeking jobs were high, ranging from $500 to $1,000, and payment was required to be made in advance. Further, the demands were linked to the actual obtaining *and withholding* of jobs rather than simply to agency efforts to, for example, obtain interviews for the applicants. Thus, the demands were categorical: Walter took a no-payment-no-job stance (*e.g.*, answering Kelso's query as to why he should pay Walter $500 by saying, "You want [your wife] to get a job, don't you."), and defendants virtually guaranteed a job if payment were made (*e.g.*, Capo's telling Frechette, upon receiving payment, "No problem. You're in."; Walter's telling Kane not to worry about the job for her sister because the money had already been turned over). Defendants' activities are thus easily distinguishable from the ordinary operations of employment agencies.

Nor do we find persuasive defendants' argument that their conduct constituted at most commercial bribery, which is not within the reach of the Hobbs Act. As the court in *Hathaway* observed, extortion and commercial bribery are not mutually exclusive. There the court noted that one of the defendants had "dangled" a contract before the victim and "manipulated the situation to play upon [the victim's] fears of missing out on the contract." 534 F.2d at 395. It concluded that even though the

victim had a history of bribing public officials and may have been the first to bring up the subject of payment, the jury could have found that the offer was born of a reasonable apprehension that payment would be required in order to secure the contract. The court concluded that defendants' "exploitation of such a fear amounted to extortion notwithstanding [the victim's] readiness and even eagerness to play the game." *Id. Cf. United States v. Kahn*, 472 F.2d 272, 278 (2d Cir.) ("Almost every bribery case involves at least some coercion by the [bribe taker]...."), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

In *Hathaway*, the court concluded that the same person could be both the victim of extortion and the briber. Here, *a fortiori*, where the defendants were "middlemen" who organized the hirings in exchange for payments, there is no conceptual reason why their conduct could not have constituted commercial bribery vis-a-vis Baron and extortion vis-a-vis the job-seekers. All that was required, for establishment of extortion within the meaning of the Hobbs Act, was proof that the job-seekers had a reasonable fear of economic loss and that the defendants intentionally exploited that fear to obtain property to which defendants were not entitled.

We thus conclude that defendants' activities were not, in theory, beyond the reach of the Hobbs Act, and we turn to the question of whether there was sufficient evidence of fear on the part of the victims to warrant characterizing defendants' payment demands as extortionate.

**B. *The Sufficiency of the Evidence of Fear***

▮ Defendants contend that even if the Hobbs Act does, in theory, extend to extortionate job-selling schemes, the evidence here was insufficient to establish extortion because there was no proof that the victims had any actual or reasonable fear of suffering economic loss if they did not pay. Given the substantive and procedural frame-

work within which this contention must be considered, we disagree.

As to substance, we have discussed above that the fear of not obtaining employment constitutes fear of economic loss within the purview of the Hobbs Act. We note further that the government was not required to prove that the defendants actually had the power to control hiring at Kodak. It sufficed if those seeking jobs there had a "reasonable fear that the defendants possessed such power and would use it if their demands were not met." *United States v. Rastelli,* 551 F.2d 902, 905 (2d Cir.), *cert. denied,* 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977).

In arguing that the evidence was insufficient to prove that those who purchased jobs from defendants had a reasonable fear, or indeed any fear, of economic loss, defendants have a heavy burden. *E.g., United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S. Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing this contention, we must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128(1983), and must affirm the conviction as long as, from the inferences reasonably drawn, the jury might fairly have found that a reasonable fear on the part of the victims was proven beyond a reasonable doubt. *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.(1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *United States v. Taylor,* 464 F.2d 240, 245 (2d Cir.1972). Our review of the record persuades us that there was adequate proof of the requisite fear.

We have set forth in detail in Part I.A. above the evidence with respect to each individual to whom a defendant sold a job and for which he was convicted of a substantive Hobbs Act violation. Summarized briefly, the evidence showed that many of the victims—or those for whom they purchased jobs—had been out of work for substantial periods of time (*e.g.,* Pfund, Himmelsbach, Bernard Gauthier, DeLeo,

and the wives of Riccardi, Kelso, and Drelick), or were having other business difficulties (Iascone). Virtually all of the them had repeatedly applied for employment at Kodak without success (*e.g.,* Rita LaDelfa, Pfund, Bernard and Brian Gauthier, De-Leo, Frechette, Angora, and the wives of Riccardi, Kelso, and Drelick); and many of them had relatives already working at Kodak through whom they had tried, unsuccessfully, to get Kodak jobs (*e.g.,* Rita La-Delfa, Pfund, Kelso's wife, DeLeo, and Frechette). To each of the victims, one of the defendants said, in essence, "You can get a job at Kodak *if* you pay me for it." Several of the victims testified that they, or someone on their behalf, paid the fees demanded by the defendant with whom they dealt because they believed it was the only way they could gain employment at Kodak. Thus, Kelso testified:

> I questioned the fact of why would it have to cost something. He [Walter] says, "You want her to get a job, don't you.... Well, I told him that yeah, she would like to work there, and—and then he told me it would cost five hundred dollars, and I says "Okay."

Kelso's wife testified that they paid Walter the $500 "[b]ecause I felt that was the only way that I could get into Kodak because I didn't have any special skills, ... and I felt that was just about my only alternative." Rita LaDelfa testified: "I didn't think I would ever get in there any other way." Bernard Gauthier, who had not had any success as a result of his own efforts, testified: "I needed a job. I needed the chance for a job.... I wasn't a kid anymore [*sic* ].... " Frechette had applied for jobs at Kodak and "[j]ust about everywhere [he] could think of," and had not been able to get a full-time job.

This evidence was adequate to support a finding that fears of economic loss existed. The reasonableness of the victims' fears that they would not get jobs at Kodak unless they met defendants' demands for payment was suggested by defendants' statements, their manner of operating, and the circumstances. In dealing with the vic-

tims, defendants made it clear that they would not get jobs for the victims unless the monetary demands were met. No one was offered free assistance; payment was demanded in advance; and Walter's response to Kelso suggested that unless Kelso paid the $500 demanded, his wife would not be hired. Further, defendants were plainly operating outside of the normal hiring channels; they required the victims to fill out new applications even though applications were already on file. Finally, the inescapable fact was that most of the victims had tried repeatedly to get Kodak jobs through their own efforts and had failed. After they paid the sums demanded by the defendants, however, every one of the victims (until the FBI investigation got under way) was hired. Bernard Gauthier, for example, watched as his son Brian managed to get an interview at Kodak on his own; but Brian was not given an offer. He was hired at Kodak only after Bernard paid Capo an $800 fee. Many of the victims knew one another, either through their employment at Rochester Products or through other channels. They were aware of their own failures to get Kodak jobs on their own and of the success of their friends or relatives in getting Kodak jobs through Walter or Ted or Capo. The jury was plainly entitled to find that the victims' fears that they would not get Kodak jobs unless they paid the moneys demanded by defendants were reasonable.

In sum, viewing the evidence in the light most favorable to the government, the jury could have found that the defendants "dangled" the possibility of Kodak jobs before the victims and "manipulated the situation to play upon [their] fears of missing out on" getting those jobs. *United States v. Hathaway*, 534 F.2d at 395. The evidence was adequate to allow a rational juror to find beyond a reasonable doubt that the victims reasonably feared economic loss if they did not make the payments demanded by the defendants.

### C. *The Jury Charge On Defendants' Knowledge of the Victims' Fears*

■ Defendants next argue that they could not validly be found guilty of extor-

tion unless they knew of their victims' fears, and they contend that the following paragraph of the court's charge failed to give this information to the jury:

> To find a defendant guilty of extortion, you must also find that the victim reasonably believed that the defendant had the power and influence with officials at Kodak to hurt the victim's prospects of obtaining employment at Kodak, even if that fear was not caused by a direct threat by the defendant, and that the victim was in fear of not obtaining a job, or of seriously reducing his chances of obtaining a job, unless he gave money to the defendant.

At trial, defendants sought amplification of the charge to include a statement that defendant could not be found guilty unless he knew of the victim's fear, arguing that "[i]f he doesn't know the victim has a fear, then he can unwittingly commit the crime without any intent to do so." Defendants renew here their contention that the failure to instruct on the requirement of knowledge removed the element of intent from the crime of extortion.

We find no merit in this contention since a review of the charge as a whole, *see, e.g., Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), reveals that, just a few sentences before the above-quoted part of the charge, the jury was explicitly instructed that "it must be proved that the defendant intended to exploit the fear of the alleged victim." The court's charge on extortion was read to the jury several times, and on each occasion the instruction that the government was required to prove that the defendant "intended to exploit the fear" was included. Since knowledge of the existence of a factor is implicit in any notion of an intent to exploit the factor, the charge as a whole did not fail to give the jury adequate guidance as to the state of mind required of the defendants.

### D. *The Sufficiency of the Evidence as to Walter's Role as a Conspirator*

Walter claims that the evidence of his participation in the conspiracy to violate

the Hobbs Act was insufficient to support his conviction. He argues that the trial evidence established only that he had engaged in conduct similar to that of his codefendants, not that he had conspired with them. This claim is without merit.

The evidence was sufficient for the jury to find that there was a conspiracy whose members included at least Baron, Forte, Ted, Capo, and Walter. Thus, Baron automatically hired people recommended by Forte and Ted, for which Baron received various "gifts" from Ted and Forte; and Capo told his sister-in-law that his job-selling contact inside Kodak was Ted, who had a contact in the personnel department. The evidence that Walter was a member of this conspiracy was both circumstantial and direct. First, he approached a number of people at Rochester Products and offered to get them jobs for a fee; he virtually guaranteed that the payors would get jobs; he virtually assured Kelso that his wife would not get a job unless Kelso paid. To be in a position to (a) offer such assurances, both positive and negative, and (b) succeed in getting a job for every buyer, Walter would have had to have entered into an agreement, either directly or through an intermediary, with someone having authority to hire at Kodak. This circumstantial evidence that Walter had such an arrangement was confirmed by Walter's response when Kane inquired as to what had happened to the application of her sister Angora: Walter told her that he had "already turned [the money] over." Finally, the inference that Walter's direct partner in the job-selling scheme was Ted was supported by evidence that when Baron learned of the FBI investigation into job-selling at Kodak and questioned Forte, he was told that Ted had said his brother was involved and had accepted a check.

■ The inference that Walter was a member of the conspiracy was not made less permissible by the facts that Baron was not acquainted with Walter and that he did not know how many brothers Ted had. A person may participate in a conspiracy without knowing the identities of all of the other coconspirators, *Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344(1951); *United States v. Cepeda*, 768 F.2d 1515, 1516–17 (2d Cir. 1985), and the jury was obviously free to infer that Walter was the brother about whose acceptance of a check Ted was nervous, since Walter had, according to the trial evidence, sold several jobs for sums paid by check.

■ The jury was properly instructed that in order to find a given defendant guilty of conspiracy, it must find beyond a reasonable doubt that a conspiracy was formed and that the defendant willfully participated in it; the jury was told that mere similarity of conduct would not suffice. Walter's argument that the evidence showed only that he had engaged in conduct similar to that of his codefendants is an argument properly addressed to the jury. On the basis of the evidence discussed above, the jury was free to reject that argument, as apparently it did. We see no basis for disturbing the jury's determination.

E. *The Sufficiency of the Evidence of an Effect on Interstate Commerce*

Finally, defendants contend that their convictions under the Hobbs Act should be set aside on jurisdictional grounds. They argue that since the victims of their extortionate activities were local residents of the Rochester area, the government failed to establish that defendants' activities had any impact on interstate commerce. This jurisdictional attack raises two questions: first, whether the interstate flow of labor may constitute "commerce" within the meaning of the Hobbs Act, and second, whether defendants' activities had the requisite degree of impact on that flow of labor. We answer both questions in the affirmative.

■ The Hobbs Act reaches extortionate acts that obstruct, delay, or affect "commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). The term "commerce" is de-

fined broadly to include commerce between points in different states, commerce between points within a single state but passing through another state, and "all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

We have little difficulty in concluding that massive hirings by a nationwide, multinational corporation such as those undertaken here by Kodak involve "commerce over which the United States has jurisdiction." The breadth of the Act's language "manifest[s] a purpose to use all the constitutional power Congress has to punish interference with interstate commerce" by means such as extortion. *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). The breadth of the Commerce Clause of the Constitution is such that the movement of laborers and other persons across state lines has been held to fall within its protection in a variety of circumstances. Thus, in *Service Machine & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 76 (5th Cir.), *aff'd mem.*, 449 U.S. 913, 101 S.Ct. 310, 66 L.Ed.2d 142 (1980), the Fifth Circuit held that an ordinance requiring all workers, including non-residents of the state, to pay a registration fee constituted an impermissible burden on commerce. In *Edwards v. California*, 314 U.S. 160, 173–74, 62 S.Ct. 164, 166–67, 86 L.Ed. 119 (1941), the Supreme Court ruled that a statute penalizing the transport of an indigent, unemployed non-resident into the state constituted an impermissible burden on commerce. In light of these authorities and the breadth of the Hobbs Act's definition of commerce, we are inclined to believe that that definition was intended to encompass the interstate flow of labor.

Further support for this proposition may be found in § 1951(c)'s caveat that § 1951 "shall not be construed to ... affect [*inter alia,*] section 17 of Title 15." Section 17, which is part of the Clayton Act, provides that "[t]he labor of a human being is not a commodity or article of commerce," and goes on to state that the antitrust laws do not forbid the formation or operation of labor unions. 15 U.S.C. § 17 (1982). Although we have found no definitive legislative history on the point, it is at least arguable that the fact that Congress thought it necessary to issue the caveat that the Hobbs Act did not affect the Clayton Act's exclusion of human labor from the concept of commerce for antitrust purposes indicates that Congress intended to include the interstate flow of labor within the concept of commerce for Hobbs Act purposes.

We are aware of only one case that has considered whether the flow of labor may constitute commerce within the meaning of the Hobbs Act. In *United States v. Hanigan*, 681 F.2d 1127 (9th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983), the Ninth Circuit upheld the Hobbs Act convictions of the defendants for having robbed three foreigners who, having previously been employed in the United States, had once again reentered the country in search of employment. The court stated that "[t]he movement of laborers across state or national boundaries constitutes commerce within the meaning of the Hobbs Act." *Id.* at 1130. In view of our reading of the Act and the scope of the Commerce Clause, we agree with the Ninth Circuit and conclude that the Act was intended to reach extortionate conduct that has the effect of impeding the movement of laborers across state lines.

■ Finally, we have no difficulty in concluding that there was sufficient evidence that defendants' activities had the requisite impact on the interstate flow of laborers. The Act reaches extortionate acts that affect commerce "in any way or degree." 18 U.S.C. § 1951(a). Recognizing the "broad and extensive reach of the commerce clause under the Hobbs Act," *United States v. Tropiano*, 418 F.2d at 1076; *see Stirone v. United States*, 361 U.S. at 215, 80 S.Ct. at 272, we have consistently held that "no more than a minimal effect" on commerce need be shown. *United States v. Scacchetti*, 668 F.2d 643, 647 (2d Cir.), *cert. denied*, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). Any effect on commerce, even one that is

"merely potential or subtle," gives the court jurisdiction under the Act. *United States v. Augello*, 451 F.2d 1167, 1170 (2d Cir.1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *see also United States v. Curcio*, 759 F.2d 237, 241–42 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 142, 88 L.Ed.2d 117 (1985); *United States v. Angelilli*, 660 F.2d 23, 35 (2nd Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982).

While most of our Hobbs Act jurisdictional decisions have concerned extortionate acts against *victims* whose businesses were engaged in, or used items flowing through, interstate commerce, *e.g.*, *United States v. Scacchetti*, 668 F.2d 643; *United States v. DeMasi*, 445 F.2d 251, 257 (2d Cir.), *cert. denied*, 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *United States v. Tropiano*, 418 F.2d at 1076–77; *see also United States v. Hanigan*, 681 F.2d at 1130 (victims were aliens who had previously found work in this country and had again entered the country to seek work); *United States v. Pearson*, 508 F.2d 595, 597 (5th Cir.) (victim hotel had large number of out-of-state visitors), *cert. denied*, 423 U.S. 845, 98 S.Ct. 82, 46 L.Ed.2d 66 (1975), the jurisdictional focus of the Act is not simply on the victim. Thus, for example, in *United States v. Daley*, 564 F.2d at 649, we held that though the extortionate acts were directed solely at local contractors, the fact that the contractors were engaged in work on the New York Thruway sufficed for Hobbs Act jurisdiction because the Thruway is a major artery of interstate commerce.

In the present case, although Kodak, the employer, was not the victim of the extortionate acts, the requisite effect on interstate commerce was established by the fact that defendants' activities in selling jobs to local residents had at least a subtle or potential impact on the ability of applicants from outside the state to obtain employment at Kodak. A random sampling of Kodak's 1982 files of 55,000 applications for nonprofessional positions indicated that approximately 8.28% of these, or more than 4,500 applications, were from out-of-state applicants. Although not all 55,000 were applications for entry-level jobs, *i.e.*, the level at which the victims here sought jobs, and although Kodak personnel department head Glen Seils testified that an entry-level job applicant from out of state who was not on a referral list would not have the best chance of being hired, Seils also testified that Kodak had in the past hired entry-level workers from out of state, using the applications it had on file. Since persons referred to Baron by the defendants were automatically hired, the availability of jobs for others, including applicants from out of state, was thereby reduced. This sufficed to meet the jurisdictional requirements of the Hobbs Act.

## III. OTHER ISSUES

### A. *False Statements*

Walter challenges his conviction under 18 U.S.C. § 1001 for making false statements to FBI agents in the course of the investigation on the grounds that his statements (1) did not mislead the agents, and (2) fell within the so-called "exculpatory no" exception to the statute. We find no merit in these contentions.

 Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

To support a conviction under § 1001, the government must establish that the defendant (1) knowingly and willfully (2) made a statement (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious and fraudu-

lent. *United States v. Silva*, 715 F.2d 43, 49 (2d Cir.1983). Some courts have considered the second element of this offense, *i.e.*, the making of a "statement," to be lacking if the defendant has merely answered an inquiry in the negative, rather than affirmatively supplying misinformation to the authorities. Called the "exculpatory no" exception, its predicate

> "is simply that a negative response cannot serve as proof of the requisite knowledge and willfulness required to convict under 18 U.S.C. § 1001, absent affirmative steps taken by the government to make the reporting requirements of the law known."

*United States v. Grotke*, 702 F.2d 49, 52 (2d Cir.1983) (quoting *United States v. Fitzgibbon*, 619 F.2d 874, 876 (10th Cir. 1980)). While this Court has never quite embraced the "exculpatory no" exception, we have consistently stated that if we did adopt it we would construe it narrowly, ruling that any statement beyond a simple "no" does not fall within the exception. *See United States v. Grotke*, 702 F.2d at 52–53; *United States v. Shanks*, 608 F.2d 73, 75–76 (2d Cir.1979), *cert. denied*, 444 U.S. 1048, 100 S.Ct. 740, 62 L.Ed.2d 736 (1980); *United States v. Adler*, 380 F.2d 917, 922 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. McCue*, 301 F.2d 452, 455 (2d Cir.), *cert. denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962). "[A]ffirmative, voluntary statement[s]," which are "readily distinguishable" from simple exculpatory denials in response to investigator's questions, would not be within the exception. *United States v. Adler*, 380 F.2d at 922.

■ Walter's responses to the FBI agents' questions regarding the checks of Kane and Annie LaDelfa did not fall within the "exculpatory no" category. When the agents showed him Kane's $500 check and asked him if he could explain it, Walter's response was not a refusal to respond or a simple "no"; he stated that Kane ran the Super Bowl pool at Rochester Products, that Walter had won the pool, and that Kane's check was in payment of his win-nings. Similarly, when asked whether he had received any other checks, Walter sought to explain the two $500 checks from Annie LaDelfa by stating that he had repaired her car and had received the checks in payment. Even if this Court were to recognize the "exculpatory no" exception, these affirmative misrepresentations would fall outside the exception.

■ Finally, Walter's contention that he could not be convicted under § 1001 because the FBI agents already knew the purpose of the checks, and his lies therefore did not mislead them, has no merit. The statute contains no requirement that the defendants' misrepresentation be successful, and we decline to read one into it.

### B. *Witness Intimidation*

■ Capo challenges the sufficiency of the evidence to support his conviction on the charge of having attempted to intimidate the witness Bernard Gauthier, in violation of 18 U.S.C. § 1512(a). He contends that his conviction on this count should be set aside because his statements to Gauthier were ambiguous and, in any event, Gauthier was not intimidated. We reject these arguments.

Section 1512(a) prohibits

knowingly us[ing] intimidation or physical force, or threaten[ing] another person, or attempt[ing] to do so, or engag[ing] in misleading conduct toward another person, with intent to—

> (1) influence the testimony of any person in an official proceeding;
>
> (2) cause or induce any person to—
>
> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; . . . .

The terms of the statute—"us[ing] intimidation . . . or attempt[ing] to do so"—plainly make unlawful not only intimidation, but attempted intimidation. We see no requirement in the statute that the attempt must have succeeded; nor will we imply one. *Cf. United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir.) ("[t]he endeavor, whether

successful or not, is the gist of the offense" of obstruction of justice under § 1503), *cert. denied,* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974). Thus we reject Capo's attempt to upset his conviction under § 1512(a) on the basis that Gauthier was not intimidated.

■ The evidence was ample to support the jury's verdict finding Capo guilty of having attempted to intimidate Gauthier in an effort to prevent his testifying in the grand jury proceeding. Capo's statements to Gauthier, made in response to Gauthier's informing Capo in February 1983 that he intended to testify before the grand jury, included Capo's gratuitous disclaimer that he was a member of the "mob," and his dropping the name of the brother of a known organized crime figure in connection with his advice that if everyone kept silent there would be no problem. Capo's contention that his statements, including his references to organized crime, were too ambiguous to be construed as threats was an argument more properly addressed to the jury. The jury was free to reject it, as it apparently did. We see no sound basis for overturning the verdict.

### C. *Obstruction of Justice*

■ Both Ted and Capo challenge their convictions for obstruction of justice in violation of 18 U.S.C. § 1503. Section 1503 makes it unlawful for a person

> corruptly or by threats or force, or by any threatening letter or communication, [to] influence[], obstruct[], or impede[], or [to] endeavor[] to influence, obstruct, or impede, the due administration of justice.

To obtain a conviction under this section, the government must show that there was a pending judicial proceeding, such as a grand jury proceeding, *United States v. Fayer,* 573 F.2d 741, 745 (2d Cir.) ("Corrupt advice under 18 U.S.C. § 1503 must relate to an investigation by the grand jury, not the F.B.I."), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *United States v. Vesich,* 724 F.2d 451, 454 (5th Cir.1984), and that the defendant knew of

and sought to influence, impede, or obstruct the judicial proceeding, *id.; see Pettibone v. United States,* 148 U.S. 197, 205–07, 13 S.Ct. 542, 546–47, 37 L.Ed. 419 (1893) (construing Rev.Stat. § 5399, a predecessor of § 1503).

■ Capo contends that the evidence was insufficient to support his conviction under this section because it was not clear that his conversations with Frechette instructed Frechette to refuse to talk to the grand jury rather than to the FBI. Ted contends that the evidence was insufficient to support his conviction because there was no proof that he knew, when he urged Scavo not to talk, that there was an existing grand jury proceeding. We find merit in neither contention.

The proof against Capo included evidence that Frechette had shown Capo the grand jury subpoena served upon him; Capo then told him not to say anything and not to worry because the payments were all in cash, and the Kodak personnel people were not talking. This was sufficient to permit a rational juror to conclude beyond a reasonable doubt that Capo was urging Frechette to withhold his testimony from the grand jury.

There was likewise sufficient evidence that Ted knew of the grand jury investigation when he urged Scavo not to reveal that his payments to Ted had been for the purpose of obtaining jobs at Kodak and to tell the people for whom he had procured those jobs not to reveal that payments had been made for that purpose. Ted's first conversation urging Scavo not to reveal that he had purchased jobs came in January 1983. On January 18, 1983, two Rochester newspapers carried articles reporting that both the FBI and the grand jury were investigating the job-selling at Kodak. There was evidence that Walter, Ted's brother and coconspirator, had known of the empaneling of the grand jury at least as early as December 1982; and that coconspirator Capo knew of the grand jury at least as early as February 1983. The last occasion on which Ted contacted Scavo to urge him to remain silent was immediately prior to

Scavo's July 1983 appearance before the grand jury. Given the entire record, including the evidence that well before Ted's final effort to persuade Scavo to remain silent, the investigation by the grand jury was known to the public in general and to the defendants who had worked through Ted to get the jobs for the buyers, there was a strong inference available that Ted too knew of the grand jury's existence. The evidence was thus sufficient to permit the jury to find that Ted's conscious purpose in conversing with Scavo was to obstruct the investigation of the grand jury.

## CONCLUSION

The judgments of conviction are in all respects affirmed.

PRATT, Circuit Judge, dissenting in part:

While I agree with my colleagues with respect to the obstruction of justice, witness intimidation, and false statement convictions, I must respectfully dissent with respect to the convictions under the Hobbs Act for extortion and conspiracy to extort. Under the law as charged to the jury, there was insufficient evidence to support the extortion convictions, but by extending the federal crime of extortion beyond any prior limits the majority concludes that these convictions should be affirmed.

Although fear of economic loss is an accepted ground for an extortion conviction, *see United States v. Brecht*, 540 F.2d 45, 52 (2d Cir.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977), *overruled on other grounds, Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), it has, until now, been limited to circumstances in which economic fear results from either threatened loss of an existing economic benefit, *see, e.g., United States v. Margiotta*, 688 F.2d 108, 133 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), or threatened preclusion from a potential economic benefit, *see, e.g., United States v. Hathaway*, 534 F.2d 386, 395 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64,

50 L.Ed.2d 79 (1976). Here, however, the concept of fear of economic loss has been further stretched to embrace the loss of a potential economic benefit for which the "victims" had no existing claim, and from which they had not been precluded. In effect, the majority, while recognizing there are "no prior applications of the Hobbs Act to a job-selling scheme such as this one", is nevertheless extending the Hobbs Act to include influence peddling and commercial bribery.

### A. *Insufficiency of Evidence*

In charging the jury on the meaning of "fear" with respect to the extortion counts, Judge Telesca explained:

The term fear does not necessarily refer to physical fear or fear of violence. For the purposes of this statute, it means the fear of economic loss, which may include a fear of economic disadvantage and fear of lost economic opportunity. In addition, the anticipation of economic loss would also constitute fear within the meaning of this statute.

It is not necessary that the Government prove that the fear of economic loss was the consequence of a direct threat made by the defendant. Nor is it necessary for the Government to prove that the defendant actually created the fear in the minds of his victims, or was responsible for creating that fear. However, it must be proved that the defendant intended to exploit the fear of the alleged victim. The fear of economic loss must be a reasonable one. The mere voluntary payment of money or delivery of property, unaccompanied by any fear of economic loss, would not constitute extortion.

In other words, if you find that any defendant asked for the payment of money as a pre-condition to his using his influence with officials at Kodak to obtain a job for someone, that alone is not extortion.

*To find the defendant guilty of extortion, you must also find that the victim reasonably believed that the defendant*

*had the power and influence* with officials at Kodak *to hurt the victim's prospects of obtaining employment* at Kodak, even if that fear was not caused by a direct threat by the defendant, *and that the victim was in fear of not obtaining a job, or of seriously reducing his chances of obtaining a job, unless he gave money to the defendant.*

(Emphasis added.) This charge, which required the jury to find that a "victim" reasonably feared that defendants would negatively affect his employment prospects if he did not pay, was, at least prior to the majority opinion in this case, a proper distillation of the law of extortion by wrongful use of fear. The only question that properly should be before us on the extortion counts, therefore, is whether there was sufficient evidence to uphold the jury's verdict under this charge. There was not.

Even drawing every inference in favor of the government, there is nothing to indicate that the victims reasonably believed that the defendants had the power and influence with officials at Kodak "to hurt" their prospects of obtaining employment at Kodak. First, there was no evidence that any of the defendants had any negative effect on any particular job application. Second, the evidence establishes that there was no "fear" of any kind on the part of those seeking jobs at Kodak; on the contrary, these "victims" gladly paid defendants, not to neutralize any negative impact defendants might have on their job prospects, but to gain an advantage over other job applicants. Third, there was no evidence that any fear of defendants' interference, even if it existed in one or more of the "victims", would have been reasonable in the circumstances, especially since the normal hiring channels at Kodak remained open and unaffected by defendants' activities. Last, there was no evidence that defendants intended to exploit any threat of being able to preclude the "victims" from employment at Kodak. Indeed, the government conceded at oral argument that there was no evidence that Kodak's normal hiring process was slowed to exploit the system and increase the number of payments received by defendants. In short, by paying defendants, the "victims" sought to realize economic opportunities to which they had no greater entitlement than those who were proceeding through normal application channels.

The majority suggests and the evidence establishes that defendants, in essence, told those seeking jobs "[y]ou can get a job at Kodak *if* you pay for it"; without anything more, however, the majority concludes that the jury could also find the job seekers reasonably feared that they would not get jobs at Kodak without paying defendants. Because there is nothing to indicate that defendants would or could intervene to impair the prospects of employment through normal channels of someone who did not pay, this negative inference has no basis in the record. The majority supports its conclusion with a statement by one of the "victims" that when he asked Walter Snacki why it would cost his wife $500 for a job, Walter answered, "You want her to get a job, don't you". This statement, however, is as neutral on the critical "fear" component of extortion as the majority's other, even less availing, examples; it cannot reasonably support an inference that defendants would *hinder* the "victims" in their efforts to be hired at Kodak if they did not pay. All it establishes, if believed, is that without payment defendants would not exercise their influence to affirmatively help the job seekers.

Significantly, as the main opinion acknowledges, most of the "victims" had previously been unsuccessful in their own efforts to be hired at Kodak. What they were paying for, then, was defendants' influence at Kodak to help them get what they had not been able to get on their own. In short, what happened here is no more than what Judge Telesca expressly charged the jury did *not* constitute extortion; namely, "if you find that any defendant asked for the payment of money as a precondition to his using his influence with officials at Kodak to obtain a job for someone, that alone is not extortion."

## B. *Stretching the Law of Extortion*

In essence, the payments to defendants here were bribes meant to secure defendants' use of their influence to the advantage of the payer. Although bribery and extortion are not necessarily mutually exclusive, *Hathaway*, 534 F.2d at 395, this court has previously distinguished commercial bribery from extortion, noting: "The difference between the commercial bribe taking charge and the unlawful activity of extortion is that only the latter involves initiative on the part of the defendant and coercion on the part of the victim", *Brecht*, 540 F.2d at 51. Recognizing that the line between bribery and extortion is thin, we have established the distinction that "if the defendant purports to have the power to *hurt* the victim in economic terms and fear is induced, the solicitation becomes an extortionate demand." *Id.* at 51 n.11 (emphasis added). By defining fear of economic loss to include "the fear that a job opportunity would be lost" when defendants did not purport to have the power to hurt—only the power to help—these "victims", the majority has subjected the nebulous activity of influence peddling, here carried out through the state crime of commercial bribery, to punishment through the federal crime of extortion.

The majority's eradication of the distinction between these crimes removes the negative element of extortion, that is, "pay me or be precluded", draws mere influence peddling within the grasp of extortion, and does so without even requiring that the means for exerting that influence be criminal under either federal or state law. Suddenly, practitioners of a number of otherwise legal occupations must fear the prospect of federal prosecution for extortion. Lawyers specializing in expediting matters before government agencies, legislative lobbyists, and even commercial brokers daily exploit the "fear" of loss of a potential economic benefit by selling their purported abilities to improve their clients' chances of getting what they want, even though the clients are not precluded from seeking the same result themselves or through other channels.

Worse yet, since the majority's references to fear are so broad and ambiguous, it is not clear what, if any, limits on the crime of extortion by wrongful use of fear of economic harm still remain. For instance, the level of economic opportunity contemplated is low. The majority "conclude[s] that the fear that *a job opportunity would be lost* is the type of fear whose extortionate exploitation is within the reach of the Hobbs Act" (emphasis added). However, the "opportunity" feared lost here was a job which most of the "victims" had failed to obtain through their own efforts. Yet the majority holds that fear of losing even this last-chance opportunity, to be realized through commercial bribery, is sufficient to qualify under the Hobbs Act. Apparently, what may constitute an "opportunity" whose loss is feared is, under the majority's test, virtually limitless in scope.

Moreover, the main opinion suggests at one point that "[t]o establish extortion, the government must prove that the victim had a reasonable fear that the defendant had an intent to exploit", and later concludes that "[i]t sufficed if those seeking jobs * * had a 'reasonable fear that the defendants possess [the power to control hiring] and would use it if their demands were not met.'" (quoting *United States v. Rastelli*, 551 F.2d 902, 905 (2d Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977)). The former formulation of criminal extortion describes no more than the concern that keeps employment agencies in business. While the latter formulation correctly adds the further requirement that defendants would preclude the "victims" if they did not pay, there is no evidence in this case to satisfy that requirement.

In sum, I dissent because the majority has gone beyond the law of the case actually submitted to the jury and in extending that law has taken one more step down the road toward complete federalization of state criminal law. I would vacate the extortion and conspiracy to extort convictions and dismiss those counts of the indictment for failure of proof, leaving intact the

convictions for obstruction of justice, witness intimidation, and false statements to a government agency.