**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mariela Coronoto SILVA,
Defendant-Appellant.**

**No. 777, Docket 82–1324.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 25, 1983.
Decided Aug. 9, 1983.

James Allen, Allen, Lippes & Shonn, Buffalo, N.Y., for defendant-appellant.

Joseph Guerra, Asst. U.S. Atty. for the Western District of New York, Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty. for the Western District of New York, Kathleen M. Mehltretter, Asst. U.S. Atty., Buffalo, N.Y., of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, PIERCE and WINTER, Circuit Judges.

PIERCE, Circuit Judge:

Mariela Coronoto Silva appeals from a final judgment of the United States District Court for the Western District of New York, John T. Elfvin, *Judge,* after a jury trial, convicting Silva of two counts of making false material statements to the United States Immigration and Naturalization Service and the United States Customs Service in violation of 18 U.S.C. § 1001 (1976).[1] Specifically, and in sequence of occurrence, appellant was convicted of falsely stating to an immigration official that she was a United States citizen (Count IV), and falsely stating to a customs official that she was not carrying over five thousand dollars into the country (Count III).[2] Post-trial, defendant moved for a judgment of acquittal notwithstanding the verdict; the motion was denied, and appellant was sentenced to three months imprisonment on each count; imposition of prison sentence was suspend-

---

1. 18 U.S.C. § 1001 reads:
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and wilfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent state-ment or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. Appellant was charged in Counts Three and Four of a four-count indictment. Counts One and Two related to Alvin MacArthur Wilson, a/k/a "James Pate," appellant's traveling companion.

ed and defendant was placed on probation for three years.

### FACTS

The facts, viewed in the light most favorable to the government, reveal the following.[3] On November 15, 1981, Mariela Silva and her traveling companion, James Pate,[4] sought entry into the United States from Canada via the Rainbow Bridge, Niagara Falls, New York. After a routine inquiry by a border inspector (who is usually a customs or immigration inspector) at the primary inspection station, Silva and her companion were directed to the secondary inspection area, where people not readily admissible after primary inspection are sent for a more detailed inspection so as not to interfere with the flow of traffic over the bridge.

At the secondary inspection area, an enclosed garage, the two travelers were questioned by Customs Inspector Frank Figueroa and Immigration Inspector Jeffrey Roulhac, who inquired of each as to their citizenship and declarable items. The immigration inspector had been alerted by the border inspector to check Silva's citizenship. Inspector Roulhac testified that he asked Silva her country of citizenship, to which she responded, "United States." He then inquired as to where in the United States she was born, and Silva responded, "Austin, Texas." Inspector Figueroa testified that he also asked Silva her citizenship, where she was born, how long she had been outside the United States, and if she had acquired anything while she was in Canada. According to Inspector Figueroa, Silva stated that she was a United States citizen; she was born in "Texas," or "Austin, Texas;" that she had been in Toronto with James

Pate for two or three days; and she had only bought a few tee-shirts and a dress. Inspector Figueroa asked Silva if she had any proof of birth or citizenship. She offered a Texas drivers license and stated that she had no other documentation in her possession. Although the inspectors testified that Silva had a "hint" of a Spanish accent, both inspectors further testified that the appellant spoke English well, and that neither had trouble understanding her responses.

The inspectors considered Silva's responses to be unsatisfactory, therefore, Inspector Roulhac directed the appellant to bring her purse and follow him to the immigration office adjacent to the garage area. Meanwhile, Inspector Figueroa took Pate to a customs office and questioned him further as to declarable items.

In the immigration office, Inspector Roulhac searched Silva's purse where he discovered her Venezuelan passport, a student visa,[5] and two bundles of American currency wrapped in rubber bands. Roulhac testified that, at the time, he did not know how much money was in the purse. The inspector asked Silva if the money belonged to her; she responded that it was not hers, that it belonged to her companion, and that she did not know how much money it was. Inspector Roulhac then reported to Inspector Figueroa that contrary to appellant's assertion, Silva was not a United States citizen, and that he had discovered her Venezuelan passport and a large sum of money in her purse.

Just prior to Inspector Roulhac's report of the fruits of his purse search, Inspector Figueroa had discovered $23,500 of undeclared currency in Pate's jacket pocket.

---

3. *United States v. Tortorello,* 480 F.2d 764, 770 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

4. "James Pate" later admitted that his true name was Alvin MacArthur Wilson, and that the birth certificate that he presented to border officials bearing the name James Pate did not belong to him. For purposes of this opinion, Wilson will be referred to as James Pate, the name he presented to the officials.

5. From a review of the record it appears that Silva is a foreign national; that she entered the United States for the second time in the summer of 1980; and that she spoke English fluently. Since arriving in this country, under a student visa, she has attended classes in English and is pursuing a degree in civil engineering at the University of Austin in Texas.

The two inspectors then rejoined Silva, and Inspector Figueroa requested that she fill out a Customs Declaration Form 6059–B which asks the entrant to list all declarable items. Inspector Figueroa instructed appellant, in English, to answer questions one through twelve, then proceeded to read aloud questions 9, 10 and 11 in Spanish. Silva filled out the form and checked the box marked "no" to question eleven, which asked whether the declarant was carrying over $5,000 in currency.[6] Inspector Figueroa then removed and counted the two packs of currency from appellant's purse. The money consisted of two packs of one hundred dollar bills, totalling $20,000. At this point, Silva was informed of her constitutional rights in both English and Spanish. Silva responded that she understood her rights and, after questioning, stated that she did not declare the money on the customs declaration form because the money did not belong to her.

Approximately one hour later, Customs Group Supervisor John Lowe arrived at the Rainbow Bridge to question Silva and Pate. After conferring with Customs Inspector Figueroa, Supervisor Lowe asked Silva why she had failed to report the $20,000 when she came into the United States. Silva responded by stating that the money belonged to her companion and that he had told her not to declare it. Silva was thereafter arrested and charged with falsely stating to an immigration official that she was a United States citizen, and falsely stating to a customs official that she was not carrying over $5,000 into the country.

In her testimony at trial, the appellant denied that Immigration Inspector Roulhac had asked her any questions dealing with citizenship, and stated that she never claimed to be a United States citizen. Silva also claimed that she did not present her passport because no one asked her to show it. Finally, Silva reasserted that she had answered "no" to question eleven on the

customs declaration form because the money did not belong to her, and denied telling Supervisor Lowe that her companion instructed her not to declare the currency. Silva's testimony was contradicted by the testimony of Inspectors Figueroa and Roulhac and Supervisor Lowe. The jury chose to believe the government's witnesses and convicted the appellant.

On appeal, appellant argues that: (1) the trial court erred in not suppressing her oral and written statements allegedly made without the benefit of *Miranda* warnings; (2) she had not made a voluntary waiver of her *Miranda* rights; (3) the evidence submitted at trial was insufficient as a matter of law to convict her; and (4) the trial court obstructed effective voir dire by disallowing proposed jury questions. For the reasons stated below, we affirm the judgment of conviction.

## DISCUSSION

### Miranda Warnings

■ It is argued by appellant that from the moment she was directed to the secondary inspection area she was in a "custodial environment" and that, therefore, her oral statements concerning her citizenship and her written statements concerning the undeclared currency were obtained in violation of her *Miranda* rights. We disagree. The interrogation herein amounted to no more than routine customs and immigration inquiries, such as are conducted at a border crossing. Under the circumstances which occurred herein, *Miranda* warnings were not required and the court properly refused to suppress evidence of appellant's comments.

This court has recognized that *Miranda* warnings need not be given to one detained at the border and subjected to a routine customs inquiry. *United States v. Moody,* 649 F.2d 124, 127 (2d Cir.1981). As the

---

**6.** Form 6059–B, question eleven, reads as follows: Are you or any family member carrying over $5,000.00 (or the equivalent value in any currency) in monetary instruments such as coin, currency, traveler's checks, money orders, or negotiable instruments in bearer form? (*If yes, you must file a report on Form 4790, as required by law.*) Note: It is not illegal to transport over $5000 in monetary instruments; however, it must be reported.

Supreme Court stated in *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), the rationale behind a routine customs inquiry is that "national self protection reasonably requir[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *See also United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977) (border searches are considered reasonable "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country. . . ."). Such routine detention and questioning is an inevitable burden commonly associated with border crossings and falls within the language of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which excludes from the warning requirements established therein certain "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" because the "compelling atmosphere inherent" in custodial interrogation "is not necessarily present." 384 U.S. at 477–78, 86 S.Ct. at 1629–30; *see Chavez-Martinez v. United States,* 407 F.2d 535, 538–39 (9th Cir.), *cert. denied,* 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969); *cf. United States v. Henry,* 604 F.2d 908, 915 (5th Cir.1979) ("[t]he *Miranda* requirement is not . . . applicable to every situation where law enforcement officers are asking questions.").

Here, Silva was exposed to only routine border detention and questioning when she was interrogated by Inspectors Roulhac and Figueroa. The responses elicited from the appellant were necessary to determine the admission status of Silva and her effects. Thus, the inspectors inquired about Silva's citizenship, the length and purpose of her trip to Canada, what items she had acquired or brought in Canada, and what items she had to declare upon entering the country. Such routine questions are necessary to enforce immigration and customs regulations, and border officials are charged with the responsibility of detaining those seeking admission in order to determine their admissibility. *See United States v. Lueck,* 678 F.2d 895, 900 (11th Cir.1982); *see also* 8 U.S.C. §§ 1225 and 1357 (1976); 19 U.S.C. § 1582 (1976).[7] Thus, although there was a detention of appellant with attendant questioning by immigration and customs officials, the circumstances surrounding the inquiry (namely, a border detention) and the routine questions asked of Silva, did not require the giving of *Miranda* warnings.

Appellant argues that the customs inquiry escalated into a custodial interrogation after the inspectors had probable cause to arrest her for falsely stating her citizenship. Thus, Silva contends that the customs service's failure to give her the *Miranda* warnings or to obtain her voluntary waiver thereof, violated her constitutional right against self-incrimination by requiring that she fill out the customs declaration form after an immigration official had already discovered her Venezuelan passport.

In *Moody,* this court ruled as the Fifth Circuit had in *Henry,* that *Miranda* warnings are required in border interrogations when the questioning of the official becomes an interrogation that is custodial in

---

**7.** 8 U.S.C. § 1225 provides for the inspection by immigration officers of aliens arriving at ports of the United States. Subsection (b) thereof states that "[e]very alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer."

8 U.S.C. § 1357 grants inspecting immigration officers the power to interrogate and arrest aliens attempting to enter the country illegally. Subsection (b) provides that an alien giving false statements to an immigration officer may be guilty of perjury and shall be punished under the perjury provisions of 18 U.S.C. § 1621. Subsection (c) grants the inspecting immigration officer the authority to conduct a warrantless search of the person and effects of an entrant whom the officer has reasonable cause to believe should be excluded.

19 U.S.C. § 1582 provides that all persons coming into the United States are subject to routine customs detention and search, and that the Secretary of the Treasury is authorized to prescribe the regulations of such border interrogations.

nature and is one in which "information is sought for the purpose of using it against [a] person in a criminal proceeding." 649 F.2d at 127 (quoting *United States v. Henry,* 604 F.2d 908, 915 (5th Cir.1979)). The facts of the *Moody* case reveal that customs officers became suspicious of appellant after noticing her in a customs inspection line at an international airport. Intrigued by Moody's nervous behavior and bulky clothing, the officers approached the traveler, identified themselves, and requested that she follow them into a private customs room. While in the room, the officers questioned the appellant, patted her down and, upon feeling an unnatural protrusion, asked her to remove her clothes. Moody pulled down her girdle and exposed a bag of contraband concealed on her body. Thereafter, one customs officer followed up the discovery by asking Moody to identify the foreign substance. The court found that Moody's response, "it is heroin," was elicited for the purpose of incriminating her in criminal proceedings.

The facts herein are distinguishable from those in *Moody.* Here, appellant's conviction in Count III (false statement regarding undeclared currency) was unrelated to the known immigration offense for which probable cause existed upon discovery of her passport.

Further, we decline the invitation to hold that an offense, once committed in the presence of a representative of one agency, precludes the other agency from pursuing its statutory duties. Thus, while probable cause existed to arrest Silva for falsely stating her citizenship to the immigration service, appellant's misstatement regarding her citizenship did not preclude the customs service from ascertaining whether Silva had further items to declare. Even though Silva made the same false declaration of citizenship to Figueroa, as a customs officer, Figueroa was duty-bound to determine whether Silva was entitled to enter the country with her effects. To hold otherwise, on the facts herein, would impair the effectiveness of either the immigration or the customs service whenever the two agencies worked in tandem at our nation's borders.

Further, Customs Inspector Figueroa did not have probable cause to arrest the appellant for a customs violation when he requested that she complete the customs declaration form. It was only after Silva had answered question eleven and after the currency had been removed from appellant's purse and counted that probable cause to arrest for a customs violation materialized—at this point she was given the *Miranda* warnings. Unlike *Moody,* where a traveler was found to be smuggling heroin concealed in her undergarments, Silva committed no customs violation by merely carrying the large amount of money in her purse, since it is not a crime to carry more than $5,000 into the United States. However, it *is* a crime wilfully to fail to report the transportation of currency over the statutorily designated amount. *United States v. Dichne,* 612 F.2d 632, 636–40 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980); *United States v. Gomez Londono,* 553 F.2d 805, 811 (2d Cir.1977); *United States v. San Juan,* 545 F.2d 314, 319 (2d Cir.1976). There was no reason for Inspector Figueroa to interrupt his customs inquiry of Silva since there was no probable cause to arrest her for a customs violation. The detention and questioning of appellant was routine and well within the statutorily-mandated duties of the customs officials, therefore, *Miranda* warnings were not required, and the failure to suppress appellant's statements was not erroneous.

### *Voluntary Waiver of Miranda Rights*

Appellant argues that although she was informed of her *Miranda* rights in both English and Spanish, she did not waive these rights, and her statements to Inspector Figueroa and Supervisor Lowe should have been suppressed. By oral ruling announced prior to the start of trial, the district court declined to accept appellant's view of the events surrounding the giving of her *Miranda* rights and denied appellant's motion to suppress the statements. We note that inexplicably the district

court's oral ruling was never transcribed in the record on appeal. In any event, since it is undisputed that the issue of waiver was presented to the court below in both parties' memoranda of law in connection with the suppression motion, we conclude that implicit in the district court's decision to deny the motion to suppress is the implied finding that Silva made a voluntary waiver of her right to remain silent. On the record before us, this was not clearly erroneous.

■ An express written or oral waiver of constitutional rights is not necessary to establish a knowing and voluntary waiver of such rights. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A valid waiver may be inferred "from the actions and words of the person interrogated." *Id.; United States v. Rubio,* 709 F.2d 146, at 152 (2d Cir.1983); *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

According to the testimony of Customs Inspector Figueroa at the suppression hearing, after he informed Silva of her constitutional rights, she indicated that she understood them and had no questions regarding her rights. Silva was informed of her rights in both English and Spanish, although she made no request for the Spanish instruction. She answered in English all questions posed to her; she did not claim to misunderstand the warnings; and she did not ask for an interpreter. According to the testimony of the government's witnesses, at no time did appellant indicate an unwillingness to answer questions addressed to her, nor did she request an attorney before making statements to either Inspector Figueroa or Supervisor Lowe. A finding that Silva made a voluntary waiver of her rights to remain silent appears from the record to be fully justified. *See United States v. Isom,* 588 F.2d 858, 862 (2d Cir. 1978); *United States v. Burgos,* 579 F.2d 747, 750 (2d Cir.1978); *United States v. Boston,* 508 F.2d at 1175.

### Sufficiency of the Evidence

■ Appellant next claims that the district court erred in denying her motion for

judgment of acquittal notwithstanding the verdict, on the ground that the government failed to prove every element of a violation of 18 U.S.C. § 1001. However, at the end of the government's case, upon the denial of her motion for acquittal, Silva chose to offer evidence on her own behalf; she thereby waived any objection to the sufficiency of the government's case. *See United States v. Maniego,* 710 F.2d 24 at 28 (2d Cir.1983); *United States v. Keuylian,* 602 F.2d 1033, 1040–41 (2d Cir.1979); *United States v. Coblentz,* 453 F.2d 503, 506 (2d Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). In any event, an examination of the evidence adduced at trial reveals that the government met its burden of offering sufficient evidence from which a jury might find violations of the statute in question.

■ Under Title 18, United States Code, Section 1001, the government must prove four elements:

1) that the defendant made a statement,

2) that the statement was made with knowledge that it was false or fictitious and fraudulent,

3) that the statement was made knowingly and wilfully, and

4) that the statement was made in relation to a matter within the jurisdiction of a department or agency of the United States.

*United States v. Adler,* 380 F.2d 917, 920 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. McCue,* 301 F.2d 452, 454 (2d Cir.), *cert. denied,* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962).

As to Count IV, the government provided sufficient evidence to establish that Silva had falsely stated to a representative of the immigration service that she was a United States citizen. Inspectors Roulhac and Figueroa both testified that appellant presented herself at the border as a United States citizen, when in fact it soon became evident that she was a Venezuelan citizen. Figueroa also testified that Silva did not

present her Venezuelan passport when asked to provide proof of citizenship. Further, Silva's Venezuelan passport was offered as evidence during the government's direct case to show that Silva had entered and departed from this country on more than one occasion, and had each time presented this passport to United States customs officials to be stamped with a customs verification stamp.

As to Count III, false statement of undeclared currency, the government offered evidence at trial to show that Silva carried over $5,000; that she completed a customs declaration form in which she denied carrying over $5,000; and that she admitted to knowingly checking "no" on the form because she was told by her companion not to declare the money.

 Appellant contends that there was no proof of her knowledge that she carried $20,000. However, it was not necessary for the government to prove that Silva knew she was carrying two hundred $100 bills; it was only necessary to prove that she knew that it was in excess of $5,000. The money found in Silva's purse consisted of two large bundles of $100 bills. The currency was not concealed in wrapping material and was bound only by rubberbands. The record reflects that each bundle of currency was approximately one and one half inches thick, and was presented to the jury in the same form in which it was initially discovered. It was reasonable for the jury to infer from such evidence, if it chose to, that appellant knew that the money exceeded $5,000 in amount.

The standard of review for testing a jury's verdict of guilt is "whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972) (quoting *Curley v. United States,* 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). Viewing the evidence as a whole, *United States v. Tramunti,* 500 F.2d

1334, 1338 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974), we find that the jury could reasonably have found appellant guilty of violating Section 1001 by falsely stating to the immigration service that she was a United States citizen, and by falsely stating to the customs service that she was not carrying more than $5,000.

## VOIR DIRE

 Appellant's final argument on appeal is that the court erred in not posing her proposed voir dire questions dealing with each juror's experience in crossing the border. The trial judge received proposed jury questions and conducted the voir dire using those questions which he determined to be appropriate. This court has held that the decision as to the questions to be asked on jury selection voir dire is entrusted to the informed discretion of the trial judge. *United States v. Barton,* 647 F.2d 224, 230 (2d Cir.1981); *United States v. Barnes,* 604 F.2d 121, 137 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and will not be disturbed by an appellate court absent a clear abuse of discretion. *United States v. Taylor,* 562 F.2d 1345, 1355 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Tramunti,* 513 F.2d 1087, 1114 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975). Upon examination of the record, we find that the trial court's voir dire embodied the substance of the requested questions and there was no abuse of discretion.

The judgment of conviction as to each count is affirmed.