**UNITED STATES of America,**

**v.**

**Ernesto TURNER, Defendant.**

**No. 86 CR 230.**

United States District Court,
E.D. New York.

July 1, 1986.

984

Reena Raggi, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. by Valerie E. Caproni, Asst. U.S. Atty., for U.S.

Louis R. Rosenthal, Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

In this ever-worsening drug infested age in which we live, the other side of the coin in the attempt to interdict the importation and distribution of controlled substances is the attempt to curtail the money laundering of the receipts and profits therefrom. Defense counsel in this motion to suppress the fruits of a border search seeks to have us interpret recently enacted 31 U.S.C. Section 5317(b) so as to thwart an attempt by Congress partially to implement this latter objective. This we decline to do; first, because Congress in such Section did not, as defendant claims herein, proscribe a border "stop" "without reasonable cause" but rather only a "stop and search" without such cause, and second, because Congress did not prescribe "suppression" as a remedy for a violation of this Section, all as more fully explained hereinafter.

\* \* \* \* \* \*

Defendant, Ernesto Turner, in this case has been charged in a two count indictment with attempting to transport monetary instruments in excess of $10,000 to a place outside of the United States without filing the required currency report and with willfully making a false statement to a United States Customs Inspector. The statutory Sections involved are 31 U.S.C. § 5316(a)(1) and § 5322, and 18 U.S.C. § 1001. Defendant has moved for dismissal of the indictment and inspection of the grand jury minutes, suppression of all evidence seized and for discovery and a bill of particulars.

## I. *Factual Background*

On March 21, 1986, defendant was preparing to board Eastern Air Lines Flight 915 at John F. Kennedy International Airport. Flight 915 was bound for Panama City. At that time several Customs Inspectors were conducting an "Outbound Currency Operation" at the departure area for Flight 915.

An Outbound Currency Operation is an effort by the United States Customs Service to enforce the currency reporting laws of the United States. An announcement over the loudspeaker system is made to the departing passengers that although it is not illegal to transport more than $10,000 out of the United States, a form must be filed with the United States Customs Service reporting the amount transported. In addition, Customs Inspectors stationed in the departure area ask passengers whether they are transporting more than $10,000 in monetary instruments. Apparently, the Inspectors have available supplies of the required "Form 4790" to furnish to those passengers who wish to file the required report. The Inspectors also request the passports and airline tickets of some departing passengers for a cursory examination. Finally, some passengers are subjected to a search after the foregoing questioning and examination of travel documents.

On March 21, 1986, defendant was stopped by Customs Inspector Dan McDonald in the jetway leading to Flight 915. Inspector McDonald asked the defendant for his passport and airline ticket. Upon examining the ticket and passport Inspector McDonald noticed that defendant had purchased his ticket with cash, that his destination was indeed Panama, which has a notorious reputation as a haven for money launderers, and that his passport reflected numerous trips into and out of the United States. At this point Inspector McDonald asked the defendant whether he had heard the announcement concerning the transportation of monetary instruments. Defendant replied that he had not. Inspector McDonald thereupon repeated the contents of the announcement to the defendant and asked the defendant whether he understood the announcement. Defendant replied in the affirmative. The Inspector noted that the defendant looked very nervous and he then asked him wheth-

er he was transporting more than $10,000 out of the United States, to which the defendant replied, "no." After this response of the defendant, Inspector McDonald asked him to open the briefcase he was carrying. The defendant complied, and Inspector McDonald found three packets of United States currency totaling approximately $17,000 in the briefcase.

The discovery of the $17,000 led Inspector McDonald to take further action. He asked the defendant whether this was all of the currency that he was taking out of the United States and the defendant said, "yes." Inspector McDonald then ordered other Inspectors to conduct a patdown of the defendant and left the jetway to call the Office of Investigation. The patdown of the defendant yielded the discovery of four more packets of United States currency in defendant's jacket and trousers. Defendant was again asked if this was all of the currency he was taking out of the United States and again he replied, "yes."

Special Agent John P. Weyman eventually responded to the jetway. Agent Weyman transported defendant to the Office of Investigation at the International Arrivals Building. Agent Weyman read defendant his *Miranda* rights and asked him whether he understood them, to which the defendant said, "yes." The Agent then asked defendant several questions, in particular whether he had any other currency, to which the defendant replied, "no." The Agent asked defendant to empty his pockets and an additional $4,000 in currency was found in his wallet. Defendant was thereupon placed under arrest.

A total of $66,880 was seized from the defendant. It should be noted also that the team of Customs Inspectors questioned several other passengers of Flight 915 and inspected their travel documents in addition to the defendant. The United States Customs Service pays special attention to flights departing for Panama, which, as indicated above, is well known as a haven for money launderers. Apparently, some other passengers were also subjected to stops and minimal searches but only the defendant was arrested.

## II. *Suppression Motion*

Defendant has moved to suppress any evidence derived from his encounter with the United States Customs Inspectors. He asserts that 31 U.S.C. § 5317(b) requires Customs Inspectors conducting currency enforcement operations to have a "reasonable suspicion" before they can approach, stop and question a departing passenger.[1] Thus, he contends that because there was nothing unusual in his behavior or manner of dress, the Customs Inspectors had no justification for their initial approach to and stop of the defendant and their initial request for travel documents. He argues that any subsequent search is therefore "tainted" with illegality and the evidence seized must be suppressed. Defendant's motion presents a novel question of law as Section 5317(b) has, to this

---

1. The parties to this case have used the term "reasonable suspicion" when referring to § 5317(b)'s statutory requirement that a Customs Officer have "reasonable cause" to believe a monetary instrument is being transported in order to conduct a warrantless search. Although it may only be a matter of semantics, the Court wishes to make it clear that "reasonable suspicion" is a proper interpretation of the "reasonable cause" standard; that is, a reasonable justification to search, which is less than probable cause.

In *United States v. Montoya De Hernandez,* —— U.S. ——, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985), the Supreme Court cautioned Courts against establishing standards other than probable cause or reasonable suspicion when discussing border searches. In *United States v. Ram-*

sey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court examined a statute which gave the Customs Service the authority to search parcels when an Officer had "reasonable cause" to believe that an item contained therein was being illegally imported. The Court said that the statutory standard was: "a practical test which imposes a less stringent requirement than that of 'probable cause' imposed by the Fourth Amendment as a requirement for the issuance of warrants," and then cited *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is thus clear that the "reasonable cause" required by § 5317(b) is in fact a requirement of reasonable suspicion. *See United States v. Arends,* 776 F.2d 262, 264 n. 1 (11th Cir.1985); *United States v. Scheer,* 600 F.2d 5 (3rd Cir. 1979).

Court's knowledge, never before been interpreted by a federal court. The issues raised have broad implications for the proper enforcement of currency laws by the United States Customs Service.

### A. Fourth Amendment Concerns

■ It is clear from the outset that the conduct of the Customs Inspectors in this case did not amount to any violation of the defendant's constitutional rights. The facts of this case clearly fall within the so-called "border search exception" to the Fourth Amendment under which routine searches at the border may be made without regard to probable cause and no warrant is necessary. *United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

■ The border search exception does not, of course, completely eviscerate the protections of the Fourth Amendment merely because the search takes place at the border or its functional equivalent. Customs Inspectors, for example, must have "reasonable suspicion" before they may detain an incoming traveler for a search beyond the normal, routine customs search and inspection, *e.g.*, for a strip search. *United States v. Montoya De Hernandez*, — U.S. —, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985); *United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *United States v. Asbury*, 586 F.2d 973, 975–76 (2d Cir. 1978). However, it is the law that an initial search of a traveler at the border may be made with no justification other than that the search occurred at the border. This preliminary search may include a person's luggage, personal belongings, outer clothing, wallet, purse, and even one's shoes. *United States v. Grotke*, 702 F.2d 49, 51–52 (2d Cir.1983).

■ The fact that the defendant in this case was an *outgoing* passenger does not change the above constitutional analysis. The vast majority of legal authority has applied the border search exception with equal force to so-called outbound searches.

The Second Circuit has clearly held that departing passengers and outgoing goods may be searched without the need for probable cause, a warrant, or even reasonable suspicion. *United States v. Ajlouny*, 629 F.2d 830, 833–34 (2d Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Swarovski*, 592 F.2d 131, 133 (2d Cir.1979).

The proposition that outgoing searches are also encompassed by the border search exception has been approved by the courts of other circuits as well. *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir.1985); *United States v. Udofot*, 711 F.2d 831, 839–40 (8th Cir.), *cert. denied*, 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *United States v. Stanley*, 545 F.2d 661, 667 (9th Cir.1976). Only one court has questioned applying the border search exception to outgoing searches but that court acquiesced to prior precedent that upheld the application. *United States v. Des Jardins*, 747 F.2d 499, 503–04 (9th Cir.1984), *rehearing*, 772 F.2d 578 (9th Cir.1985).

Given the above case law, it is plain that the defendant may make no constitutional challenge to the items seized. *See Julian v. United States*, 463 U.S. 1308, 103 S.Ct. 3522, 77 L.Ed.2d 1290 (1983) (Rehnquist, J., Circuit Justice). The actions of the Customs Inspectors were minimally intrusive and thus well within the ambit of a routine border search and inspection. Any claim of the defendant must find support in an area other than the Fourth Amendment.

### B. Statutory Constraints

Defendant correctly points out that even though a search may be permissible as a constitutional matter, Congress may exercise its law-making authority to restrict further the search authority of federal law enforcement officials by statute. Congress has done this with respect to the authority of Customs officials to search for monetary instruments being transported in violation

of 31 U.S.C. § 5316. In 1984, 31 U.S.C. § 5317(b) was enacted, which provides as follows:

>    (b) A customs officer *may stop and search*, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officer has *reasonable cause to believe* there is a monetary instrument being transported in violation of section 5316 of this title.

(Emphasis added.)

Citing *United States v. Chemaly*, 741 F.2d 1346 (11th Cir.1984), *reinstated en banc United States v. Bacca-Beltran*, 764 F.2d 747 (11th Cir.1985), and *United States v. Swarovski, supra*, defendant argues that prior to 1984 there was a split in authority as to whether persons departing from the United States could be subjected to random, warrantless searches. He argues that since the 1984 amendment which added § 5317(b), it is clear that Customs officials need reasonable suspicion to search individuals for currency violations and he cites *United States v. Arends*, 776 F.2d 262 (11th Cir.1985), in support of this proposition. Defendant concludes and argues that a proper interpretation of § 5317(b) forbids the "stop" or initial contact, as occurred in this case, between a passenger and a Customs Inspector, where the Inspector examines the passenger's travel documents and questions the passenger regarding the transportation of monetary instruments, absent reasonable suspicion. A careful reading of the cases cited and an examination of the legislative history of § 5317(b) as well as the statutory framework convinces us that defendant's arguments are at the same time illogical and against the spirit and purpose of the legislative design.

Prior to 1984 there was in fact no division of authority as to whether departing travelers might properly be subject to random, warrantless searches. As already discussed, from a constitutional standpoint such activity was totally (and still is) permissible. However, as part of the Currency and Foreign Transactions Reporting Act (also known as the Bank Secrecy Act of 1970), Congress imposed extra restrictions on those searches executed for the express purpose of detecting violations of the currency reporting requirements. Former 31 U.S.C. § 1105 (which was recodified at 31 U.S.C. § 5317) provided in part:

(a) If the Secretary has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed or contains material omissions or misstatements, he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of any or all of the following:

> (1) One or more designated persons
> . . .
> (3) One or more designated or described letters, parcels, packages, or other physical objects. . . .

Any application for a search warrant pursuant to this section shall be accompanied by allegations of fact supporting the application.

(b) This section is not in derogation of the authority of the Secretary under any other law.

*United States v. Chemaly, supra*, did not question the constitutional proposition that the border search exception permitted warrantless searches of outgoing travelers. Rather, the Court in *Chemaly* held that the border search exception did not constitute "other authority of the Secretary" which would permit a circumvention of the warrant requirement of former 31 U.S.C. § 1105(a) [§ 5317(a)]. *United States v. Arends, supra*, also dealt with this prior statute that imposed a warrant requirement on the Customs Service to search for monetary instruments. Neither of these two cases dealt directly with the current § 5317(b), enacted in 1984, which significantly *expanded* the search authority of the Customs Service. *United States v.*

*Swarovski, supra,* did not involve a search for currency at all. It should also be noted that the warrant requirement of former § 5317(a) [§ 1105(a) ] was not always given the strict interpretation of *Chemaly* and *Arends.* In *United States v. Rojas,* 671 F.2d 159, 166–67 (5th Cir.1982), the Court held that a voluntary consent to search was sufficient authority to search, obviating the warrant requirement of then Section 1105.

In fact, prior to 1984, Congress had for years been wrestling with the problem of the laundering of the profits of illegal drug trafficking and there had been strong efforts at expanding the authority of the Customs Service to search for monetary instruments being transported in violation of the currency reporting laws. Innumerable hearings were held before various House and Senate committees concerning the problem of the vast amounts of cash profits produced by illegal drug trafficking.

The scope of the profits that results from drug trafficking is truly amazing and indeed startling. Back in 1979 there were estimates that the revenues produced were on the order of $50 billion. An indication of this was the fact that the Federal Reserve Bank in Florida had a $3.2 billion surplus of cash in small denominations at that time. *Illegal Narcotics Profits: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs,* 96th Cong. 1st Sess. 19 (1979) (testimony of Irvin B. Nathan, Deputy Assistant Attorney General, United States Department of Justice) (hereinafter *"Illegal Narcotics Hearings "*). Despite the strenuous efforts of our federal law enforcement agencies, the Court has heard estimates that equal or exceed the present budget deficit and there is no doubt that the illicit cash flow is at present much greater than it was in 1979.

Moreover, there can be no question that in order to be successful in the struggle against drug traffickers, we must attempt to reach their illegal profits. The 4790 Forms gathered by the Customs Service are a vital tool in this effort. The information garnered in this fashion can be and is put to use by the Drug Enforcement Administration in their investigation of narcotics dealers. *See Illegal Narcotics Hearings,* 117 (statement of Richard J. Davis, Assistant Secretary of the Treasury). Part of the problem in the past has been the fact that efforts to enforce the currency reporting requirements have been lax. Congress was made aware that at many United States airports persons transporting illegal drug profits were subject to little scrutiny upon leaving the United States. Departing passengers were not questioned and currency reporting forms were not even made available by Customs officials. It was alleged that in one case a single individual laundered one-half billion dollars in narcotics profits over a three to four year period. Staff of the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs, 98th Cong., 1st Sess., *Study of Crime and Secrecy: The Use of Offshore Banks and Companies,* 115–16, 120, 123 (Comm.Print 1983).

It is against this background that efforts were made to expand the search authority of the Customs Service in order to encourage the increased enforcement of the currency reporting laws. The "father" of these efforts may be said to be Congressman John J. LaFalce, who introduced the original legislation which eventually resulted in the present § 5317(b). It is clear that Congressman LaFalce intended to expand the search authority of the Customs Service to search for monetary instruments as much as was constitutionally possible:

Mr. LaFalce: Well, you raise an excellent point, as usual, Senator. But I think what we should do is *give Customs officials the full authority that is theirs under the Constitution.* I do not think that we should statutorily inhibit it, and that is precisely what we have done. So what I seek to do is remove the statutory inhibitions.

. . . . .

Mr. LaFalce: ... If Senator Proxmire would think that, this bill would be half a loaf rather than the full loaf, or if it

would be a crumb rather than half a loaf; well then, to the extent that you would minimize the ability to search, then we would go to half a crumb. And that is the point.

*I don't think that we should minimize the authority of Customs, so long as it would be constitutional.*

Senator Mitchell: And then essentially your testimony, as I understand it, is that, had not the Bank Secrecy Act passed in its present form, this legislation would not be necessary, and the courts would have inevitably continued the position which you suggest they have adopted for 200 years and have permitted this?

Mr. LaFalce: Precisely.

Senator Mitchell: And so all you're suggesting is that we return to the standard which was applied prior to the enactment of the Bank Secrecy Act, which in your judgment—

Mr. LaFalce: Which constitutionally could have been applied, correct.

*Banks and Narcotics Money Flow in South Florida: Hearings on S. 2236 Before the Senate Comm. on Banking, Housing, and Urban Affairs,* 96th Cong., 2nd Sess. 127–28 (1980) (testimony of Congressman John J. LaFalce) (emphasis added).

Previously, Congressman LaFalce had expressed his view that the Customs Service should have the same authority to search for illegal currency as for any other contraband. *Patterns of Currency Transactions and Their Relationship to Narcotics Traffic: Hearings on H.R. 5961 Before the Subcomm. on General Oversight and Renegotiation of the House Comm. on Banking, Finance and Urban Affairs,* 96th Cong., 1st Sess. 17 (1979) (statement of Congressman John J. LaFalce).

Congressman LaFalce's efforts eventually resulted in the Money Laundering Penalties Act of 1984, part of the Comprehensive Crime Control Act of 1984, which enacted H.R. 6031, the bill containing the present version of § 5317(b) that had long before been proposed by Congressman LaFalce.

The House Report accompanying H.R. 6031 suggested that the intention was to grant the Customs Service a limited warrantless search authority for currency; an authority somewhat less than that which would be allowed under the Constitution. H.R.Rep. 98–984 Part 1, 98th Cong., 2nd Sess., at 8 (1984). LaFalce himself apparently accepted the view that H.R. 6031 would not permit the Customs Service to conduct the full range of constitutionally permissible searches for currency:

Second, this bill would allow customs officials to search for unreported amounts of cash when they have reasonable cause to believe that currency is being transported in violation of the reporting requirements. Searches permitted by this bill would be in accordance with judicial interpretations of the authority of customs officials to undertake border searches, and, in fact, the legislation is drawn in such a way as to restrict the authority of customs officials *in conducting such searches* in a manner stronger than that applied by the Constitution and the courts.

Cong.Rec. H 9252 (September 10, 1984) (statement of Congressman LaFalce) (emphasis supplied).

It is also clear that Congress viewed this measure as increasing the law enforcement authority of the Customs Service, remedying gaps in the law. Congressman Benjamin A. Gilman noted the following in discussing H.R. 6031:

The Select Committee on Narcotics Abuse and Control, of which I am the ranking minority member, has long recognized the need for revisions in the Currency and Foreign Transactions Reporting Act to make it easier for law enforcement authorities to get at the enormous profits acquired in the illicit drug trade. Accordingly, I applaud the work of the Banking and Judiciary Committees, and join with the distinguished chairman of the Narcotics Select Committee (Mr. Rangel), with whom I serve as the ranking

minority members, in urging support of this legislation.

Cong.Rec. E 3801 (September 12, 1984).

Similarly, Congressman Charles B. Rangel noted:

Mr. Rangel: Mr. Speaker, as chairman of the Select Committee on Narcotics Abuse and Control, I rise in support of H.R. 6031, the Money Laundering Penalties Act of 1984. This bill will enhance the ability of Federal law enforcement agencies, particularly the Customs Service, to ferret out the financial base of drug trafficking and other organized criminal activity.

Cong.Rec. E 3764 (September 11, 1984).

■ This brief overview of the legislative history of Section 5317(b) shows two clear trends: Congress was well aware of the enormous problem law enforcement authorities were facing in the huge cash flow that accompanies drug trafficking and wished to greatly enhance the ability of federal agencies to enforce the currency reporting laws. At the same time, Congress did not wish to expand the *search* authority of the Customs Service to the limits of the Constitution. Although these competing trends raise some question as to exactly what Congress intended when it authorized a "stop and search" when a Customs official has "reasonable cause to believe" a monetary instrument is being transported in violation of Section 5316, it seems clear to us that their intent was so to limit only "stops and searches" not "stops" alone.

In this Court's opinion Section 5317(b), though an improvement over the former § 5317(a), which required a warrant prior to search, does not go far enough and places an illogical restriction on the authority of the Customs Service. The Constitution places virtually no limitation on the authority of the Customs Service to conduct searches at the border of incoming or outgoing travelers or objects. Why then should the Customs Service need reasonable suspicion to search for currency while a routine search for any other contraband is justified merely because it takes place at the border? Section 5317(b) creates the anomalous result that it would be perfectly permissible for the Customs Service to seize currency in the course of a border search for narcotics or other illegal commodities, while currency seized during a search whose express purpose is the seizure of illegally transported monetary instruments would be impermissible unless the Inspectors first had reasonable suspicion.

It could hardly be argued that outgoing searches of passengers or cargo are any more burdensome or any more of an invasion of privacy than incoming searches. Furthermore, in the case of outbound searches for currency, the same justifications for search are present as in routine inbound searches for narcotics; namely, the protection of the nation against the importation of dangerous contraband. This is precisely because the huge amounts of currency leaving the country are used to finance the transactions that later result in the importation of narcotics.

■ Of course, even when the Court doubts the wisdom of a particular statute it must accept it and attempt to interpret it in accordance with the intention of its drafters. In this regard the Court must assume that when Congress enacted the Money Laundering Penalties Act of 1984 it was aware of the judicial interpretations of the relevant regulatory and statutory scheme then in existence.

■ The duty to file a report regarding the transportation of more than $10,000 out of the United States does not arise until the "time of departure." *See* 31 C.F.R. § 103.-25(b). The decisions are varied but it appears that although the passenger need not physically leave the United States for the time of departure to occur, he must have clearly manifested an intention to leave, for example, by either checking his baggage or entering the departure area. *See United States v. Gomez Londono,* 553 F.2d 805, 810 (2d Cir.1977); *United States v. Cutaia,* 511 F.Supp. 619, 624–25 (E.D.N.Y.1981). To commit the crime of failure to file a

currency transaction report, the passenger must willfully neglect to file the currency transaction report at the time of departure. In this sense then a Customs official would never have probable cause to stop for this offense unless the passenger at the time of departure is offered the opportunity to file a report and either denies the transportation of more than $10,000 in currency or flatly refuses to file the report or submits a report containing falsehoods. *See United States v. Silva*, 715 F.2d 43, 48 (2d Cir. 1983); *United States v. Rojas*, 617 F.2d at 165.

If the defendant's interpretation of § 5317(b) were accepted, that Customs officials may not approach and stop a passenger and ask questions and request travel documents unless they have reasonable suspicion, the enforcement of the currency reporting laws would become an impossibility. Customs officials would never, as a practical matter, obtain the probable cause necessary to stop a suspect, absent the tip of an informant or other such basis giving rise to a reasonable suspicion. The great majority of money launderers could fail to file the required reports and board their flights unmolested.

Customs officials must have probable cause before they may arrest someone for willfully failing to file a currency transaction report (Form 4790). Inspectors may not simply arrest all passengers in the departure area who have failed to file a report as obviously most would not be transporting more than $10,000 and those who are may have simply forgotten to file the required report or be ignorant of its requirement. Yet under the defendant's interpretation of § 5317(b), the Inspectors may not even approach and stop a passenger to notify him or her of the reporting requirement or ask whether he or she is transporting more than $10,000 out of the United States unless they first have reasonable suspicion. Thus Customs Inspectors would be able to question and develop probable cause to arrest only those passengers who are literally leaving a trail of twenty and hundred dollar bills on their way to the aircraft, or perhaps those passengers as to whom the Customs authorities have received reliable information from informants concerning the transportation of currency.

Given the gravity of the problem of the laundering of narcotics proceeds and the concern of Congress with enhancing the ability of the Customs Service to enforce the currency reporting laws, it is not rational to conclude that Congress intended the absurd result advocated by the defendant, which would severely limit the enforcement of those laws. The Second Circuit has noted that it is indeed the duty of Customs Inspectors to ask those leaving the country whether they are transporting more than the statutory amount. *United States v. Gomez Londono*, 553 F.2d at 811. Nothing in § 5317(b) prevents Customs Inspectors from making efforts to notify departing passengers of the reporting requirements, asking passengers whether they are transporting more than $10,000 out of the country and inspecting travel documents.

■ The clear intent of Congress in enacting the Money Laundering Penalties Act of 1984 was to facilitate the efforts of the Customs Service to encourage more people to file currency transaction reports. The Outbound Currency Operations of the Customs Service, where Inspectors inform people of the reporting requirements and encourage them to file the reports by asking them whether they are transporting more than $10,000 out of the country and examining travel documents, are well in keeping with the spirit of the legislation. Indeed, it was the previous laxity of the Customs Service in enforcing the reporting requirements that in part inspired the enactment of § 5317(b). It should also be noted that this notification effort of the Customs Service is merely a routine Customs inquiry, *not* a custodial interrogation, and, of course, no *Miranda* warnings are required. *United States v. Silva*, 715 F.2d at 48; *United States v. Gomez Londono*, 553 F.2d at 811.

What § 5317(b) was intended to prohibit without reasonable cause was a "stop *and* search." Thus, although this Court as indicated doubts the wisdom of the restriction, § 5317(b) does not permit the routine examination of baggage, personal belongings and outer clothing that Customs Inspectors would normally be able to do in a border search, unless they have reasonable suspicion. The statute *only* applies to those Customs inspections conducted solely for the purpose of detecting violations of the currency reporting laws, as in the present case. The test for determining the legality of a search conducted pursuant to § 5317(b) is whether *after* the Customs Inspector has questioned the passenger and examined his travel documents the Inspector has reasonable suspicion to believe that monetary instruments are being transported without the proper report having been filed.

In the present case the Customs Inspector had sufficient reasonable suspicion to search the defendant's briefcase and outer clothing. Defendant was traveling to a location with a notorious reputation as being a haven for money laundering. His passport reflected numerous trips to and from the United States and his ticket had been purchased with cash. The Inspector had personally explained the reporting requirement to the defendant and the defendant answered in the negative when asked if he was transporting more than $10,000 out of the United States. The defendant also appeared nervous to the Inspector. Finally, this entire event took place in the jetway leading to the aircraft, which is clearly a point and time of departure at which the duty to file a report has arisen. *See United States v. $831,160.45 United States Currency*, 607 F.Supp. 1407, 1413–14 (N.D.Cal.1985), *aff'd*, 785 F.2d 317 (9th Cir.1986). At this point, the Inspector had more than ample reasonable suspicion to examine defendant's briefcase and outer clothing. The searches of defendant in this case were thus well within the requirements of § 5317(b).

The Court also holds that, even if a violation of § 5317(b) did occur, there are no grounds on which to suppress the evidence seized. The exclusionary rule is a judicially created device to remedy violations of the Fourth Amendment and deter unconstitutional police misconduct. As previously discussed, there was no constitutional violation in this case. Moreover, the conduct of the Customs Inspectors in this case does not shock the conscience of the Court, the searches were reasonable and minimally intrusive. Congress, although it has expressly done so in other situations, *see, e.g.,* 18 U.S.C. § 2518(10)(a) (defendant may move to suppress illegally obtained wire or oral communications), provided no such or other explicit remedy for a violation of § 5317(b) by Customs Inspectors. The Court has found nothing in the legislative history to suggest that Congress intended the exclusion of evidence to be the remedy for a violation of § 5317(b) and exclusion of evidence would be contrary to the general purpose of Congress in passing the statute.

Based on all of the foregoing analysis, defendant's motion to suppress evidence must be and hereby is denied.

### III. *Other Motions*

Defendant's motion to dismiss the indictment and to inspect the grand jury minutes is both frivolous and without merit and is hereby denied. As for defendant's boiler plate requests for discovery and a bill of particulars, the Court has confidence that the Assistant United States Attorney will fully comply with her obligations under the Federal Rules of Criminal Procedure and relevant case law. The defendant may make an application at some later time if he feels he has not received all the material to which he is legally entitled.

SO ORDERED.