**UNITED STATES of America**

**v.**

**Alfred COVINO, Defendant.**

**No. 86 Cr. 531–CLB.**

United States District Court,
S.D. New York.

Feb. 3, 1987.

Bruce A. Green, Asst. U.S. Atty., U.S. Atty's. Office, S.D.N.Y., New York City, for plaintiff.

George J. Koelzer, Ober, Kaler, Grimes & Shriver, New York City, for defendant.

## MEMORANDUM AND ORDER

### [Post-trial Motions]

BRIEANT, Chief Judge.

Following a jury verdict which convicted him on 16 counts of a 20 count Indictment, finding him not guilty on four of the counts, Alfred Covino moves for a judgment of acquittal pursuant to Rule 29(c), F.R.Crim.P., or alternatively for a new trial pursuant to Rule 33, F.R.Crim.P. The motion for a new trial need not detain us, since the Court finds no infirmity in the procedures followed at the first trial.

The counts of which the defendant was convicted charged; violation of the Hobbs Act, 18 U.S.C. § 1951 (Counts 1 through 5, and 8); violation of the Travel Act, 18 U.S.C. § 1952 (Counts 9 through 13, and 16); and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 17 through 20).

*Facts Established at the Trial*

These convictions all arise out of the same factual context. The facts upon which the Government relied were essentially undisputed. Viewed most favorably to the Government, as it must be, the trial record established the facts set forth below.

Defendant was an executive of Nynex Mobile Communications, Inc., (hereinafter "Nynex" or "the telephone company"), having the job title of "Director of Network Services." He had a long history of prior favorable employment with a division of the American Telephone and Telegraph Company and was receiving an annual salary of $57,600 at the time of the commission of these crimes. His responsibilities extended to operation and construction.

Nynex was engaged in providing mobile stations for relaying telephone calls to and from automobiles and trucks. The electronic principles upon which this service is based involved the construction of "cell sites," which are small structures containing switching gear which can receive and transmit messages within a given radius from their location, for as a user travels on the highways from one area to another his transmissions and reception must be within the geographic limits or radius of a cell site. Nynex at the time had a competitor in the Northeastern area, referred to at the trial as "Cellular One." It was a competitive advantage for Nynex to have more cell sites operating and in place sooner, thereby giving a greater usefulness to the subscriber. Once the subscriber passes into an area not within the radius of transmission and reception of a cell site, no service is available. Accordingly, it was in the interests of Nynex to construct as many cell sites as possible, as quickly as possible. Defendant Covino had a substantial responsibility in connection with this effort.

The Government's principal witness was Robert Brennan who had been immunized. Together with Joseph Boyd, also an immunized witness, Brennan was the half-owner of a small construction business with a grandiloquent name, known as Great Northeastern Building and Management Corporation ("Great Northeastern"), which Brennan operated from his home in New Jersey, with his wife doing the bookkeeping and drawing the checks.

Beginning as a carpenter and local official, Brennan had developed an expertise in the rapid, economic erection of fast-food restaurants. These structures, like cell sites, involve so-called "cookie cutter construction," and a contractor's ability to erect such structures economically and quickly improves, as additional, almost identical structures are erected.

Brennan's corporation began its efforts for Nynex as a "consultant," apparently providing clerk of the works service at sites being built by other contractors for Nynex. Continuing this activity until the end of 1984, Great Northeastern also undertook to build certain cell sites as the prime contractor. Cells erected by Great Northeastern included those located near Boston and Buffalo, as well as one in the Town of Greenburgh in Westchester County, New York, adjacent to White Plains.

At all relevant times, Nynex had its office at the Blue Hill Plaza in Pearl River, New York, in this District. Nynex provided a free telephone for Brennan's automobile and the wire fraud was committed by means of telephone calls made thereon between Brennan in New Jersey, and Covino in Pearl River, New York.

The business relationship between Great Northeastern and Nynex was within the direct, although not exclusive, supervision and control of Covino. As a practical matter, Covino had the power to cause Nynex to allow or disallow claims for extra work, the lifeblood of the construction industry. He and his subordinate, Jeff Gordon, who was also paid money by Brennan, had the power to approve or disapprove invoices, acting together with other Nynex executives, and had a voice in the decision making process by which Great Northeastern would be awarded other sites upon which to construct additional cells.

It is probably fair to say that Covino, acting alone, could do nothing for Brennan or his company. He could undoubtedly delay payment of invoices, bring to light real or fancied disputes concerning the invoices, and recommend for or against retention of Great Northeastern for additional construction.

Throughout its dealings with Nynex, Great Northeastern was overextended and short on capital. A small, two person corporation, it had no substantial equipment, and its entire staff consisted of Brennan, Boyd, a couple of job superintendents, and Brennan's wife, acting as bookkeeper.

The initial misconduct between the parties was initiated by Covino, who told Brennan in a conversation in Covino's office that one Becker, a former employee of Great Northeastern had run up a telephone bill of $3,200, using a Nynex credit card furnished to him in connection with his work to make calls in connection with the business of Nynex, and that the charges had been run up illegally. According to Brennan, Covino represented that these charges had been made to the credit card illegally after the employee Becker had

ceased working on Nynex projects, and that "if Joe Farina [Covino's superior] found out [Brennan] wouldn't look good." Brennan offered to pay the improper telephone charges, but defendant said that he "would take care of it." *Facile decensus Averno!* This transaction of covering up the phone bill began the illicit relationship between Covino and Brennan.

A couple of months later Covino solicited from Brennan "ideas on construction of a sun deck" for Covino's home. Brennan obliged by presenting some sketches of four to six different renderings, which Covino could discuss with his wife. Covino rejected the sketches and determined to have Ralph Mignone, another Nynex vendor, who was an architect, do the design work. A week later Brennan was instructed by Covino to erect a sun deck, which later turned out to be a full "Florida" room; to keep the cost of it within single digits (*i.e.*, less than $10,000); and to keep in mind the telephone bills. The Government proved at trial that a very significant addition to Covino's home, referred to as a Florida room, was constructed by Great Northeastern between July and August, 1984. Referred to by Covino as "his favorite cell site," the erection of this sun room represented an economic transfer from Great Northeastern to Covino amounting to at least $20,000, exclusive of the cost of supervision. This included payment by Great Northeastern of subcontractors, including electricians and plumbers.

In August or in September, 1984 Covino offered a check for $15,000 to Brennan to be cashed and returned to "make it look as if he paid for the sun room." Brennan, however, refused to do this. Thereafter, Great Northeastern made substantial repairs to a sump-pump at Covino's home, at his request, and refaced an existing fireplace; reconstructed the back porch in November, 1984, and built a deck and steps on the so-called "Florida room."

In October 1984, the consulting contract with Great Northeastern was ended because people at the telephone company, including Covino, realized that there was

an inherent conflict in having Brennan's company act as a consultant hired to supervise the work of other contractors, while at the same time competing with them by acting as a general contractor itself for other cell sites. In October 1984, at a time when Great Northeastern was doing the majority of the Nynex work in the New York and Boston area, the consulting contract was cancelled by Nynex, apparently without objection by Brennan.

Shortly thereafter, Covino told Brennan that he needed money for his son's education, and needed $25,000. Whether this conversation took place is a disputed issue. Defendant showed some evidence that he had made arrangements for the education of his children. However, in reviewing the verdict, this Court must and will assume that the jurors agreed with the Government's version of the facts. In December, 1984, according to Brennan, Covino telephoned him on the mobile telephone, which was amenable to unintentional eavesdropping, and said that he wanted a "ton of gravel." The next day, in a conversation at Covino's office at Nynex, Covino explained that a ton of gravel meant $10,000.

The operative testimony of Brennan as to this transaction is simply that "he [Covino] said he wanted $10,000 and I agreed to pay it." In this fashion began a sequence of payments obtained by Covino from the funds of Great Northeastern by Brennan or his wife cashing checks. These funds were delivered and received in cash and in a surreptitious fashion. On the first payoff, Covino instructed Brennan to place and leave the money underneath the passenger side rear floormat of his green Lincoln automobile in Red Bank, New Jersey, and Brennan, who had obtained $12,000 in cash from the bank, left $1,000 more than was asked for. He did this by mistake, and later in the evening received back the $1,000 from Covino.

Thereafter, Covino had Great Northeastern pay by check to an autobody repair company the cost of repairs to a Nynex company car which had been involved in an accident. For reasons of his own, Covino did not wish to report the accident to his employer. The check of Great Northeastern was given to the bodyshop partly filled out, and apparently as a part of the usual income tax fraud which is an aspect of most bribery situations, Brennan falsely noted on the check that the repairs were for the usual contractor's Cadillac, owned by Great Northeastern.

Thereafter, in late 1984 in Covino's office, Covino, in the presence of Brennan, and in order to avoid being overheard, wrote on a plain piece of paper in calendar format, figures which he explained called for three payments of $20,000 each and one payment of $10,000 over the next four months. The conversation was simple: Covino pointed out that the construction program then ongoing at Nynex was a "once in a lifetime situation," and said in substance, "I want to get my share, do you?" As might be expected, Brennan responded in the affirmative.

Thereafter, by clandestine means, and dealing in cash, acting each time in response to requests for one or two tons of gravel, Brennan made to Covino and Covino received the payments charged in the Indictment to the extent found by the jury.

Brennan had a contemporaneous discussion with Joseph Boyd about the matter, and Boyd testified that he saw the calendar for payoffs, which Covino had written.

We have set forth this tawdry conduct in greater detail than necessary simply to focus on the concept of a "threat". Brennan testified, I think truthfully, that the quality and promptness of the work of Great Northeastern was not favorably viewed by some of the executives at Nynex; that for a relatively small organization, he and Boyd had been receiving the lion's share of the work in the area, having constructed at least twenty sites; and as Brennan testified: "I was afraid if I resisted we would lose our contract." Brennan perceived correctly that Covino had the power, alone, or with others, to issue change orders on job sites, or withhold issuance thereof, or to bring about the cancellation of the contract or delay the approval of vouchers for pay-

ments on account. By these and other means within his power, Covino was in a position to cause significant economic loss to Great Northeastern. However, at no time did Covino "threaten" Brennan in any way, in the common meaning of that word, as discussed below. The totality of the proof before the jury is entirely consistent with a request by Covino for a bribe, made in the traditional fashion in which such matters are transacted.

*The Jury Instructions*

On this regard our trial jury was charged as follows:

"Counts One through Eight of the indictment charge the defendant with extortion in violation of the Hobbs Act, Title 18, United States Code, Section 1951.

"The Hobbs Act provides, in relevant part, that: 'whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by ... extortion, or attempts ... to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section' is guilty of a crime.

"Extortion is the taking of another person's property or money *with* his consent. This consent is induced or brought about through the use, or threatened use, or force, violence or fear."

\*      \*      \*      \*      \*      \*

"Counts Nine through Sixteen of the indictment charge the defendant with traveling and causing another person to travel in interstate commerce for the purpose of promoting commercial bribery in violation of New York State law.

\*      \*      \*      \*      \*      \*

"Section 180.05 of the New York State Penal Law provides that: 'an employee ... is guilty of commercial bribe receiving when, without the consent of his employer ... he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefits will influence his conduct in relation to his employer's ... affairs.'

"The term 'bribery' as it has been used in this charge refers to the crime of *receiving* a commercial bribe, as opposed to the separate and distinct crime of *paying* a commercial bribe."

\*      \*      \*      \*      \*      \*

"At this point, members of the jury, it is useful to point out a distinction between the crime of receiving a bribe, charged as a violation of the Travel Act in Counts Nine through Sixteen, and the crime of extortion, charged as a violation of the Hobbs Act in Counts One through Eight.

"Receiving a bribe, as defined for you in these instructions entails soliciting or accepting a payment from another in exchange for allowing one's decision making to be influenced to benefit the other person.

"Extortion, as I have defined it, entails inducing another to make a payment through the use or threat of use of force, violence, or fear, including fear of economic loss, to be experienced unless the victim consents to the paying of money or giving of property or services.

"The difference between the commercial bribe taking charge and the unlawful activity of extortion is that only extortion involves coercion or threats on the part of the person committing the crime of extortion. Only if the defendant threatens to *hurt* the victim in economic terms and fear of economic loss is reasonably induced, does the request for money or goods or services become an extortionate demand. This aspect of threat and fear of economic loss reasonably induced is what distinguishes the crime of extortion from a mere request for money without a threat, but based on an express or implied promise to help rather than hurt the person in the decision making process, which is what bribery entails.

"In this case, if you find beyond a reasonable doubt that the defendant only had the intention to *help* Mr. Brennan and Great Northeastern in return for

money and services, but did not threaten to *hurt* them unless they paid money and services, then you cannot find that the defendant made an extortionate demand. You can find commercial bribery."

"Threat" is defined in *Webster's Deluxe Unabridged Dictionary*, (2d ed. 1979), as "a statement or expression of intention to hurt, destroy, punish, etc., as in retaliation or intimidation." "Bribe" is defined in the same work as a "prize, reward, gift, or favor bestowed or promised to induce one to commit a wrong or illegal act."

*Sufficiency of the Evidence*

Defendant has moved for a judgment of acquittal on the sixteen counts of which he was convicted. The Court finds merit in his motion respecting the six extortion counts, Counts One through Five, and Eight, in view of the absence of any proof at trial of the element of threat or wrongful use of fear.

In *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972), the Second Circuit set forth the standard to be applied by a trial court confronted with a motion for a judgment of acquittal:

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter." (footnotes omitted) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir.), *cert. denied*, 331 U.S. 837 [67 S.Ct. 1512, 91 L.Ed. 1850] (1947)).

The Second Circuit reaffirmed this standard in *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.1980), where it stated,

"Furthermore, '[i]t is axiomatic on motion for acquittal that all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense.' *United States v. Skinner*, 138 U.S.App. D.C. 121, 123, 425 F.2d 552, 554 (D.C.Cir. 1970)."

The trial judge cannot substitute his judgment for that of the jury, and is not "entitled to set aside the guilty verdict simply because he would have reached a different result had he been the fact-finder." *United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984).

■ A conviction for extortion within the meaning of the Hobbs Act requires proof of use, or threat of use, of force, violence, or fear, including fear of economic loss, to be experienced unless the victim consents to the paying of money or giving of property or services. To establish the wrongful use of fear, the government must prove that the victim had a reasonable fear that the defendant had an intent to exploit. *See United States v. Capo*, 791 F.2d 1054, 1062 (2d Cir.1986) (rehearing *en banc* granted and presently undecided); *United States v. Margiotta*, 688 F.2d 108, 135 (2d Cir.1982). The victim's fear need not be fear of bodily harm but may be fear of a loss that is purely economic. *United States v. Daley*, 564 F.2d 645, 648 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Brecht*, 540 F.2d 45, 51 (2d Cir.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

■ Although the victim's fear of harm or loss need not be instilled by the defendant, *United States v. Margiotta*, 688 F.2d at 135, there must be some proof that the defendant, aware of the victim's fear, did or said something in exploitation of that

fear. *United States v. O'Grady,* 742 F.2d 682, 688 (2d Cir.1984) (*en banc*). In other words, in the present case there must be some proof that the defendant induced the payment of money, goods, or services by *threatening* to hurt the victim in some way unless payment was tendered.

Our Court of Appeals recently strengthened the requirement that the government prove inducement. In *United States v. O'Grady,* the Second Circuit reversed convictions under the Hobbs Act for extortion under color of official right, criticizing

> "the federal courts [which] have converted the crime from a narrow prohibition aimed at public officials who demand or receive a fee not due them or their office, into a broad license for 'federal authorities to police influence peddling in the political processes of the states.' *United States v. Mazzei,* 521 F.2d [639,] 652 [ (3d Cir.) (en banc) ] (Gibbons, J., dissenting) [*cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) ]."

742 F.2d at 687. The Court of Appeals declined to equate the mere acceptance of benefits by a public official with wrongful use of public office, and required that the government "show that the public official *induced* the benefits received." 742 F.2d at 688 (emphasis in original).

Similarly, in *United States v. Capo,* two members of a panel of the Second Circuit stated:

> "We recognize, of course, that fear of economic loss plays a role in many business transactions that are entirely legitimate; awareness of that fear and use of it as leverage in bargaining, in which each side offers the other property, services, or rights it legitimately owns or controls, is not made unlawful by the Hobbs Act. What the Act reaches is not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property to which the exploiter is not entitled."

791 F.2d at 1063.

The majority opinion in *Capo* upheld convictions for extortion based on a job-selling scheme. The three defendants, friends of an employment counselor at the Eastman Kodak Company, had referred individuals for positions at Kodak's manufacturing facilities after collecting from those individuals amounts ranging from $500 to $1,000. Nearly every individual referred eventually was hired by Kodak. Only two of the defendants worked for Kodak, and there was no contention that the scheme involved any breach of fiduciary duty to Kodak, which, although it had developed an extensive job application process, tacitly approved the hiring of individuals informally referred to the company who sidestepped that slow and often unproductive procedure. The panel's majority opinion rejected the defendants' argument that their conduct constituted at most commercial bribery not in the reach of the Hobbs Act, instead describing defendants' conduct as wrongful use of the victims' fear of loss of an opportunity to obtain employment.

Circuit Judge Pratt dissented in *Capo,* observing that the majority had "stretched" the element of fear of economic loss "to embrace the loss of a potential economic benefit for which the 'victims' had no existing claim, and from which they had not been precluded." 791 F.2d at 1071 (Pratt, J., dissenting). Judge Pratt stated that the majority's definition of fear of economic loss to include "the fear that a job opportunity would be lost" eradicated the distinction between the crimes of extortion, on the one hand, and influence peddling and commercial bribery, on the other. By doing so, the majority had, in Judge Pratt's opinion, removed "the negative element of extortion, that is, 'pay me or be precluded' ", thus exposing to federal prosecution for extortion the "otherwise legal occupations" of "[l]awyers specializing in expediting matters before government agencies, legislative lobbyists, and even commercial brokers [who] daily exploit the 'fear' of loss of a potential economic benefit by selling their purported abilities to improve their clients' chances of getting what they want." 791 F.2d at 1073 (Pratt, J., dissenting).

Judge Pratt viewed the majority opinion as "one more step down the road toward complete federalization of state criminal law." 791 F.2d at 1073 (Pratt, J., dissenting).

The Second Circuit has reheard the *Capo* case *en banc* and a decision is pending. This Court will not speculate as to which, if either, of the views of the *Capo* panel will be represented in the *en banc* decision, although we assume that a majority of circuit judges voting for rehearing must have shared the concerns expressed by Judge Pratt. Sound principles of criminal law and substantial justice guide this Court in ruling that defendant Covino is entitled to acquittal on the extortion counts.

■ Reviewing the evidence adduced at trial, there was not sufficient evidence of wrongful use of fear to uphold the jury's verdict. Indeed, there was *no* evidence of conduct by anybody involving a threat. Even drawing every inference in favor of the Government, it could not reasonably be found that defendant induced the payment of money and services by threatening to hurt or impose a loss on Brennan or Great Northeastern, or by action or words intended to exploit Brennan's fear of economic loss. Brennan and Great Northeastern did not have a legal entitlement to future contracts to build cell sites for Nynex, and hoped only that the payments to Covino would gain his assistance in procuring such contracts. There was no evidence of a threat by defendant Covino to interfere with the existing business relationship between Great Northeastern and Nynex. At most the evidence established that defendant's conduct amounted to the boast, "pay me and be assisted," but did not constitute "the negative element of extortion, that is 'pay me or be precluded.'" *United States v. Capo*, 791 F.2d 1073 (Pratt, J., dissenting).

■ We recognize that there is a whiff of extortion in every bribe situation which originates with the recipient, and that every successful extortion presents some of the characteristics of bribery. But Congress in enacting the Hobbs Act, and in its use of the plain language therein contained, could not have intended to reach, and federalize, every non-threatening bribe solicitation.

Our examination of the meaning of the Hobbs Act must be informed by the principle that the Supreme Court has expressed as the "rule of lenity." *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). The rule of lenity requires that

"when a choice has to be made between two readings of what Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."

*United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–222, 73 S.Ct. 227, 229–30, 97 L.Ed. 260 (1952). Read fairly and in accordance with the rule of lenity, the Hobbs Act is not addressed to commercial bribery.

■ In cases involving federal, as opposed to state, criminal statutes, the Supreme Court has invoked a second principle, that of federalism, to construe such statutes narrowly. In *United States v. Bass*, the Court construed § 1202(a) of the Omnibus Crime Control and Safe Streets Act of 1968, making it a federal crime to receive or possess a firearm, to require proof of a nexus with interstate commerce. The Court's decision to so read the statute reflects its view that if Congress had intended to participate in the policing of purely local criminal conduct, it would have made specific provisions to do so. The Court held

"unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by

the States. This Congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrine. See, *e.g.*, *Younger v. Harris*, 401 U.S. 371 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971).... In the instant case, the broad construction urged by the Government renders traditional local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources."

404 U.S. at 349, 350, 92 S.Ct. at 523, 524; *United States v. Enmons*, 410 U.S. 396, 411–412, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973) (declining to construe the Hobbs Act to reach the use of violence in a labor dispute because Congress did not intend "such an unprecedented incursion into the criminal jurisdiction of the States").

Congress has not stated a clear intention to use the Hobbs Act to replace or duplicate state efforts at policing incidents of commercial bribery. It is in the interests of federalism that this Court refrain from a broad construction of the extortion statute which would allow "such an unprecedented incursion into the criminal jurisdiction of the States." Judge Miner of the Second Circuit Court of Appeals has observed that "[t]he restricted role intended for the federal government in regard to the exercise of criminal jurisdiction is apparent from a reading of the Constitution itself[,]" and that "something is lost in the process" of federalizing the criminal law, namely,

"the traditions of democratic self-government and of individual involvement and neighborly concern that have been the hallmarks of our society. To invite federal authorities to define and prosecute crime involving activities primarily of state and local interest is to concede that state and local government cannot be moved to serve the will of the people."

Speech on September 18, 1986, to the New York Federalist Society.

It cannot be maintained that either the extortion provision of the Hobbs Act or its legislative history embody a finding that state and local government has abdicated its responsibility to define and prosecute the crime of commercial bribery. The evidence at the trial in this case established at most commercial bribe solicitation. As dictated by the principles of lenity and federalism, the federal extortion statute cannot serve as the instrument of defendant's conviction for commercial bribery.

Defendant is acquitted pursuant to Rule 29(c), F.R.Crim.P., as to Counts One through Five, and Eight. In all other respects the motions are denied.

Imposition of sentence on those Counts not dismissed will take place on February 23, 1987, at 9:00 AM in White Plains, New York. At that time, a single judgment will be filed herein.

So Ordered.